# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTHERN PLAINS RESOURCE
COUNCIL, INC., a Montana Non-
Profit Corporation,
                    *Petitioner,*

NATIVE ACTION INC., a Montana
Non-Profit Corporation,
                    *Petitioner-Intervenor,*

                    v.

THE SURFACE TRANSPORTATION
BOARD; UNITED STATES OF AMERICA,
                    *Respondents,*

TONGUE RIVER RAILROAD COMPANY,
                    *Respondent-Intervenor.*

No. 97-70037

TRAN No.
30186

NATIVE ACTION INC., a Montana
Non-Profit Corporation,
                    *Petitioner,*

                    v.

THE SURFACE TRANSPORTATION
BOARD; UNITED STATES OF
AMERICA,
                    *Respondents.*

No. 97-70099

TRAN No.
30186

21421

UNITED TRANSPORTATION UNION–
GENERAL COMMITTEE OF
ADJUSTMENT (GO–386); UNITED
TRANSPORTATION UNION–MONTANA
STATE LEGISLATIVE BOARD,
                    *Petitioners,*

            v.

THE SURFACE TRANSPORTATION
BOARD; UNITED STATES OF
AMERICA,
                    *Respondents,*

TONGUE RIVER RAILROAD COMPANY,
        *Respondent-Intervenor.*

No. 97-70217
TRAN
No. 30186

NORTHERN PLAINS RESOURCE
COUNCIL; CITY OF FORSYTH; UNITED
TRANSPORTATION UNION; GENERAL
COMMITTEE FOR ADJUSTMENT (GO–
386); UNITED TRANSPORTATION
UNION–MONTANA STATE
LEGISLATIVE BOARD; MARK FIX,
                    *Petitioners,*

NATIVE ACTION INC.,
        *Petitioner-Intervenor,*

            v.

THE SURFACE TRANSPORTATION
BOARD; UNITED STATES OF
AMERICA,
                    *Respondents,*

TONGUE RIVER RAILROAD COMPANY,
        *Respondent-Intervenor.*

No. 07-74348
TRAN No.
30186
OPINION

On Petition for Review of Orders of the
Surface Transportation Board,
Department of Transportation

Argued and Submitted
July 11, 2011—Portland, Oregon

Filed December 29, 2011

Before: Alfred T. Goodwin, Harry Pregerson, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Jack R. Tuholske (argued), Tuholske Law Office PC, Missoula, Montana; John Meyer, Cottonwood Environmental Law Center, Bozeman, Montana, for the petitioner.

Virginia Strasser (argued), Raymond Atkins, Evelyn G. Kitay, and Theodore Hunt, Department of Transportation, Surface Transportation Board, Washington, D.C.; Joan M. Pepin, Department of Justice, Environmental & Natural Resources Division, Washington, D.C.; Robert B. Nicholson and John P. Fonte, Department of Justice, Antitrust Division, Washington, D.C., for the respondents.

Gordon P. MacDougall (argued), Washington, D.C.; Gary Ryder, Hysham, Montana; Joe A. Rodriguez, Lame Deer, Montana, for the petitioner-intervenor.

David Corburn (argued) and Betty Jo Christian, Steptoe & Johnson LLP, Washington, D.C.; Thomas Ebzery, Billings, Montana; John G. Crist, Crist, Krogh & Nord LLC, Billings, Montana, for the respondent-intervenor.

---

## OPINION

M. SMITH, Circuit Judge:

This case arises out of three applications by the Tongue River Railroad Company, Inc. (TRRC) to build a 130-mile railroad line in Southeastern Montana to haul coal. The Surface Transportation Board (Board), or its predecessor, the Interstate Commerce Commission (ICC), approved each of the three applications (individually, TRRC I, II, and III). Northern Plains Resource Council, Inc. (NPRC), Mark Fix, the City of Forsyth, Native Action, Inc. (Native Action), and United Transportation Union-General Committee of Adjust-

ment (UTU-GCA) (collectively, Petitioners) challenge TRRC II and III. Petitioners challenge the approval of TRRC II and III on a number of environmental and public convenience and necessity grounds.

We hold that the Board failed to take the requisite "hard look" at certain material environmental impacts inherent in TRRC II and III in the manner required by the National Environmental Policy Act (NEPA) prior to approving those applications. We further hold that the Board did not err in its public convenience and necessity analyses, except with respect to its reliance on the viability of TRRC II during the approval of TRRC III. Accordingly, we reverse and remand in part, and affirm in part.

## BACKGROUND

### I. Statutory Framework

#### A. NEPA Requirements

NEPA requires that federal agencies prepare "a detailed statement by the responsible official on . . . the environmental impact" of any federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). NEPA's purpose is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity*, 538 F.3d at 1185.

Regulations governing how NEPA is implemented have been promulgated by the Council of Environmental Quality, at 40 C.F.R. §§ 1505.1-1508.28. Regulations governing how NEPA applies to the constructions of railroads have also been promulgated by the Board, at 49 C.F.R. § 1105.1-1105.12. An

environmental impact statement (EIS) is normally prepared for new railroad construction projects by the Board's Section of Environmental Analysis (SEA). *See* 49 C.F.R. §§ 1105.2, 1105.6(a). An EIS must analyze the direct, indirect, and cumulative impacts from a proposed action. 40 C.F.R. § 1508.25(c). The SEA first invites public comment on the scope of the issues to be analyzed in the EIS. 49 C.F.R. § 1105.10(a)(2). After finalizing the scope of the issues to be considered, and completing consultations and site visits, the SEA issues a draft EIS (DEIS). *Id.* § 1105.10(a)(3). Public comments may be submitted to the SEA after the DEIS has been issued. *Id.* § 1105.10(a)(4). The SEA's final EIS (FEIS) discusses comments received, and any changes made to the DEIS in response to those comments. *Id.* The FEIS, and any comments and responses to the DEIS, are part of the record considered by the Board in deciding whether to grant an application. *Id.* § 1105.10(f).

## B.  Licensing of New Railroad Lines

Under 49 U.S.C. § 10901, the Board has exclusive licensing authority for the construction and operation of new railroad lines. A proceeding to grant authority begins when an application is filed with the Board. 49 U.S.C. § 10901(b). Under Section 10901(c), as amended by the Interstate Commerce Commission Termination Act (ICCTA) of 1995, the Board "shall issue a certificate authorizing activities for which such authority is requested in an application filed under subsection (b) unless the Board finds that such activities are inconsistent with the public convenience and necessity." 49 U.S.C. § 10901(c).[1]

---

[1]As further discussed in Section II.A, this post-ICCTA statute governs the issuance of TRRC III. At the time the TRRC II application was filed, Section 10901 provided that a rail carrier may construct an additional railroad line only if the ICC, the Board's predecessor, found that the "present or future public convenience and necessity require or permit the construction or acquisition (or both) and operation of the railroad line." 49 U.S.C. § 10901 (1980).

## II.   Factual Background

The TRRC seeks to construct and operate a railroad line in the Tongue River Valley in southeastern Montana. *See* endnote 1, fig. 1-1. In 1983, the TRRC filed an application with the ICC[2] to construct an 89-mile railroad line between Miles City and Ashland, Montana. *See Tongue River R.R. Co.—Rail Construction and Operation—in Custer, Powder River and Rosebud Counties, MT*, Finance Docket No. 30186, 1986 ICC LEXIS 314, at \*1 (ICC 1986). The purpose of the line was to serve new coal mines in the Ashland area. The plan was to connect the new line to the main line railroad at Miles City, presently owned by Burlington Northern Santa Fe Railroad (BNSF). *Id.* The ICC approved the TRRC I application on May 1, 1986. *Id.* The issuance of the TRRC I application is not before us in this litigation. We note, however, that to date the TRRC I line has not been constructed.

In 1989, the TRRC filed an application with the ICC to construct and operate an approximately 41-mile-long railroad line from Ashland to Decker, Montana. This line, TRRC II, was intended to connect with TRRC I to create a combined railroad line of approximately 130 miles. The purpose of TRRC II was to bring coal from Wyoming's Powder River Basin to the BNSF main line in Miles City, and then on to other destinations in the Midwest.

The ICC was concerned about potential environmental impacts that would be caused by the construction of TRRC II's "preferred route," as submitted in its application. As a result, the ICC also evaluated an alternate route called the "Four Mile Creek Alternative," which was approximately ten miles longer than the TRRC's preferred route requested in its TRRC II application. In April 1996, the Board issued its FEIS

---

[2]In 1995, Congress, through the ICCTA, amended the railroad statutes and the ICC was replaced by the Board. *See* Pub. L. No. 104-88, 109 Stat. 803 (1995).

for the TRRC II project. In October 1996, the Board issued its decision approving TRRC II, utilizing the Four Mile Creek Alternative with numerous mitigation conditions. The Board also required that the TRRC build the entire line from Ashland to Decker and the 89-mile line from Miles City to Ashland, approved in TRRC I, within three years of the date of its TRRC II decision.

Petitioners sought reconsideration of TRRC II, which the Board denied. Petitioners NPRC, UTU-GCA, and Native Action all filed appeals to our court.[3] Subsequently, the TRRC (and BNSF through intervention) also petitioned for reconsideration of TRRC II, claiming that new studies showed the Four Mile Creek Alternative was not viable from an engineering and operational perspective, and, instead, proposed a new alternative, the 17.4-mile "Western Alignment." The Board denied the TRRC petition for reconsideration in December 1997 on the grounds that its objections could have been raised earlier, but left open the possibility that the TRRC could file a new application for the Western Alignment. In 1998, Petitioners' appeals in this matter were ordered held in abeyance pending the Board's decision concerning TRRC III, discussed *infra*. In 1999, the Board revoked the condition that the entire line be built within three years of its TRRC II decision, and did not impose any future time limit on construction of the line.

In April 1998, the TRRC filed a new application to build the Western Alignment rather than the Four Mile Creek Alternative. That proceeding is called TRRC III in this appeal. Subsequently, the NEPA process was delayed for almost three years due to TRRC's financial problems. In October 2004, the Board's contractor issued a Draft Supplemental Environmental Impact Statement (DSEIS) for TRRC III. The Final Supplemental Environmental Impact Statement (FSEIS) was

---

[3]These three appeals—case numbers 97-70037, 97-70099, and 97-70217—are three of the four consolidated cases before us.

completed in 2006 for TRRC III, and included updates to the environmental reviews in TRRC I and TRRC II. On October 5, 2007, the Board approved the construction and operation of the Western Alignment along with numerous mitigation measures. Petitioners timely appeal.

## STANDARD OF REVIEW AND JURISDICTION

### I.   Review of NEPA Claims

Section 706 of the Administrative Procedure Act (APA) governs judicial review of agency decisions made pursuant to NEPA. 5 U.S.C. § 706; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004). An agency's action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)) (internal quotations marks and brackets omitted.

> [W]e will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 987 (citations and internal quotation marks omitted). We look to the evidence the agency has provided to support

its conclusions, along with materials in the record, to make this determination. *Id.* at 993.

A court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *See Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). The court is not to "act as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988. And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id*. at 1000 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

While we afford deference to the judgment and expertise of the agency, the agency must, at a minimum, support its conclusions with studies that the agency deems reliable. *Lands Council*, 537 F.3d at 994. The agency must "explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable." *Id.* The agency will have acted arbitrarily and capriciously when "the record plainly demonstrates that [the agency] made a clear error in judgment in concluding that a project meets the requirements" of NEPA. *See id.*

NEPA imposes a procedural requirement on federal agencies to "take[ ] a 'hard look' at the potential environmental consequences of the proposed action." *Or. Natural Res. Council v. Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th Cir. 2006) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004)). "Judicial review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Responsi-*

*ble Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008) (citing *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)). Through these procedural requirements, NEPA seeks to make certain that agencies "will have available, and will carefully consider, detailed information concerning significant environmental impacts, and that the relevant information will be made available to the larger [public] audience." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citations and internal quotation marks omitted).

## II.   Review of the Railroad Application

"Our review of the construction given by an agency to a statute it administers is limited and deferential." *Wash. State Dep't of Game v. I.C.C.*, 829 F.2d 877, 879 (9th Cir. 1987). We review the agency's statutory construction under the analytical framework set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-45 (1984). *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1086 (9th Cir. 2007). First, we inquire whether Congress has addressed directly the issue before the court. *Chevron*, 467 U.S. at 842. If Congress has clearly spoken on the issue, our inquiry ends and the agency "must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. We are compelled to overrule an agency's interpretation if it is "contrary to clear congressional intent." *Id*. at 843 n. 9. However, if the statute does not address the specific issue before us, or does so ambiguously, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. The agency's construction must therefore only be "reasonable" and need not be the same as the construction the court itself would have embraced had it reviewed the statute de novo. *Id*. at 843-44. "[T]he court does not simply impose its own construction on the statute . . . ." *Id.* at 843.

We review decisions by the Board on railroad application approvals under the APA, 5 U.S.C. § 706(2). *DHX*, 501 F.3d

at 1086. An agency's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Board's factual findings must be upheld if they are supported by substantial evidence. *In re Transcon Lines*, 89 F.3d 559, 564 (9th Cir. 1996).

## III.   Jurisdiction.

We have jurisdiction under 28 U.S.C. §§ 2321(a), 2342(5), and 2344.

## DISCUSSION

## I.   Environmental Claims

### A.   Cumulative Impacts

"NEPA requires that where several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (citation and internal quotation marks omitted). The pertinent regulation defines cumulative impact as follows:

> Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

A cumulative impact analysis "must be more than perfunctory; it must provide 'a useful analysis of the cumulative

impacts of past, present, and future projects.' " *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999)). To be useful to decision makers and the public, the cumulative impact analysis must include "some quantified or detailed information; . . . general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379-80 (9th Cir. 1998)). Federal agencies may "aggregate [ ] cumulative effects analysis" for NEPA purposes. *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1217 (9th Cir. 2008) ("[A]gencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effects of all past actions combined." (quoting Council on Environmental Quality Memorandum, "Guidance on Consideration of Past Actions in Cumulative Effects Analysis" (June 24, 2005))).

Petitioners contend that the Board's cumulative impact analysis in TRRC III ignores the combined impacts of future coal bed methane[4] (CBM) well development and coal mining projects that will also come into being in Southeastern Montana. Petitioners further contend that the Board failed to account for the combined effects of the referenced projects and the likely effects on air quality, wildlife, and water quality of the proposed construction and operation of the TRRC railroad. We agree with Petitioners' contentions concerning the

---

[4]CBM is a natural gas. The gas is trapped in coal seams and held in place by water pressure in coal seam aquifers. To release the gas, developers build wells to drill underground into the aquifers and pump out the water contained in the aquifers. After the aquifer is depleted of all its water, the methane gas is released and can be piped to the surface.

cumulative foreseeable effects of CBM wells and the Otter Creek Coal Mine.

### 1. Coal Bed Methane

In 2003, the Bureau of Land Management (BLM) and the State of Montana finished a programmatic EIS (Methane EIS) that evaluated the future impacts of CBM development in the Powder River Basin. Bureau of Land Management, *Final Statewide Oil and Gas Envtl. Impact Statement* (Jan. 2003) (*Methane EIS*), *available at* http://www.blm.gov/mt/st/en/fo/ miles_city_field_office/og_eis.html. The Methane EIS determined that a reasonably foreseeable development scenario in Montana over the next 20 years would involve drilling between 10,000 and 26,000 new CBM wells and 250 and 975 conventional oil and gas wells. *Id.* at 4-5. The Tongue River Valley is an area of concentration for such wells. *Id.* at Map 4-1. The Board incorporated the Methane EIS in its preparation of the FSEIS in TRRC III.

The Board also evaluated the cumulative impact of nine approved sites for CBM development near the TRRC sites. The BLM and the State of Montana had previously issued Environmental Assessments (EAs) for each of the projects and found that "no cumulative impacts are expected to occur" because adverse impacts were likely to occur only if there was simultaneous construction of the CBM wells and the TRRC railroad, and that project construction would not overlap. Notably, the Board found that "[t]he simultaneous construction of CBM gas wells could result in cumulative effects on land use." Ultimately, however, the Board concluded that because "impacts of current CBM proposals would not occur within the same temporal parameters as construction of the Tongue River Railroad, no cumulative impacts would result." As a result, the Board determined that there would be no cumulative impacts from the nine approved CBM projects.

### a.   Five-Year Time Frame

Importantly, in order to reach its no cumulative impacts conclusion, the Board limited its analysis to projects that would be constructed within a five year period. Petitioners challenge this limitation. The Board defends its decision to use a five-year period to analyze cumulative effects because that period accounts for the time period necessary to construct the railroad (estimated to be three years) and to operate the railroad for two years thereafter. Further, the Board argues that it often uses a five-year period when examining environmental effects. Moreover, the Board maintains that any analysis focused on a time period after five years is wholly speculative because of likely changes in economic growth, industry growth, and shifts in energy transportation policies. Viewed in light of the facts presented by this case, we disagree with the Board.

Each project is different, and the agency is required to rationally explain its decision in the context of project-specific effects. *See* Council on Envtl. Quality, *Considering Cumulative Effects Under the National Environmental Policy Act*, Office of NEPA Policy and Compliance, 16 (Jan. 1997), *available at* http://energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-ConsidCumulEffects.pdf ("The time frame of the *project-specific* analysis should also be evaluated to determine its applicability to the cumulative effects analysis.") (emphasis added); *see also Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003) (recognizing that the scope of the EIS is a "delicate choice" and should be entrusted to the agency but the agency must have "considered the relevant factors and articulated a rational connection between the facts found and the choice made") (citation omitted).

**[1]** The Board partially justifies its use of a five-year limitation period because it has used a similar time framework in the past. However, in this case, the BLM and State of Mon-

tana's study projects a significant growth of CBM wells over the next 20 years. *Methane EIS* at 4-5. Thus, they anticipated that building CBM wells will continue well after the termination of a five-year time framework. The Board does not explain why its default five-year time frame should necessarily apply under these circumstances.

The Board also reasoned that five years was appropriate because it would allow for approximately three years of construction time, followed by two years of operation time. The Board's assumption that the railroad would be constructed and operational within five years of approval in 2007 is clearly flawed in light of the history of this railroad project, which has been under way for almost three decades, starting with TRRC I's approval in 1986. To date, construction has not begun on any section of the railroad. Accordingly, there is little reason to presume that the railroad would be constructed in five years, which—importantly for the Board's analysis—means that we can place little confidence in the Board's assumption that the project will not overlap with reasonably foreseeable CBM projects. Moreover, time restrictions for the construction of TRRC I and TRRC II were withdrawn, and TRRC III contains no construction time requirements. If we credit the 20-year BLM analysis and actual railroad construction is pushed out beyond five years, there may be overlapping CBM well construction. However, the Board's environmental analysis—which admits that cumulative impacts may result from simultaneous development—does not address this issue or account for this possibility.

In its decision, the Board worked around the Methane EIS by concluding that it would be too speculative to determine the effects from wells that are not already approved. In other words, because the Board does not know specific construction time lines or locations, it will await the development of site-specific EISs before including the known projects into its analysis. We acknowledge that the Board is not required to

engage in speculative analysis. As we have explained, "[i]t is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now, nor do we require the government to do the impractical, if not enough information is available to permit meaningful consideration." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (internal quotation marks and citation omitted).

However, projects need not be finalized before they are reasonably foreseeable. "NEPA requires that an EIS engage in reasonable forecasting. Because speculation is . . . implicit in NEPA, [ ] we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *Selkirk*, 336 F.3d at 962 (internal quotation marks and citation omitted). As the Environmental Protection Agency (EPA) also has noted, "reasonably foreseeable future actions need to be considered even if they are not specific proposals." EPA, *Consideration of Cumulative Impact Analysis in EPA Review of NEPA Documents*, Office of Federal Activities, 12-13 (May 1999), *available at* http://www.epa.gov/compliance/resources/policies/nepa/cumulative.pdf.

The TRRC is not operating in a vacuum. The route for the railroad is known, including the terrain and counties in which it would operate. Likewise, the Methane EIS has described in some detail the likely scope of CBM development in the future. Although the Methane EIS is a programmatic document, it is specific to the number of wells, field compressors, roads, and pipelines for each of the three counties that the TRRC railroad would cross. *Methane EIS*, Minerals Appendix at 17-22. For example, in Big Horn County (where Decker, Montana, the end of the railroad in TRRC III, is located), an estimated 2,500 to 7,000 CBM wells are reasonably foreseeable, and most of the wells would be located in the southeastern part of the county, where Decker is located. *Id.* at 17. The EIS also projected that 100 to 250 field compressors and

1,450 to 4,200 miles of gathering lines would be built in this area. *Id.* at 17. Similarly, in Rosebud County (where Ashland, Montana, the other end of the railroad in TRRC III is located), an estimated 1,000 to 2,800 CBM wells will be drilled, along with 40 to 100 field compressors and 600 to 1,650 miles of gathering lines. *Id.* at 19. The greatest concentration of CBM development is anticipated to occur in the Rosebud, Big Horn, and neighboring Powder River Counties, which is proximate to where the TRRC railroad will run. *Id.* at Map 4-1.

**[2]** In short, the BLM and the State of Montana have described a time frame and a reasonably foreseeable development plan for CBM development in areas that overlap with the TRRC railroad plans. Under the circumstances, the Board has not sufficiently explained why it cannot or should not incorporate this available data concerning likely future development into its environmental impact analysis. We do not ask the Board to peer into a crystal ball. *See Selkirk*, 336 F.3d at 962. The Methane EIS report contained actual numbers, broken down by counties, about development over the next 20 years. We conclude, therefore, that in this case, an adequate cumulative impact analysis necessarily requires that such information be included. Accordingly, we hold that the Board arbitrarily and capriciously relied on the five-year time frame, which resulted in a faulty analysis of the possible cumulative impacts from reasonably foreseeable CBM projects that could overlap construction of the railroad line.

### b.   Nine Approved CBM Sites

Petitioners also argue that the Board's EIS did not properly consider the effects of the nine already-approved CBM wells. These projects were either under consideration or had already been approved by the time the TRRC III environmental study and Plans of Development (PODs) for the projects were submitted to the Board for consideration. The Board concluded that any potentially significant cumulative impacts would be limited to the construction period, and that there would be no

overlap between the well construction and the railroad construction activities. Petitioners contend that the Board failed to consider the significant long-term cumulative operational impact of the railroad and these wells.

[3] We conclude that this finding by the Board was not arbitrary and capricious. First, Petitioners do not present any evidence that the construction of the approved projects will overlap with TRRC construction. The Board concluded that the construction for the approved CBMs typically occur within two to sixth months after their approval and in some cases, construction had already begun at the time of the analysis. Thus, there would be no overlap with railroad construction, which would not occur until much later. We cannot overturn this finding without evidence to the contrary. Second, the Board did address both construction and operational impacts in many areas, including land use, biological resources, soil and geology, hydrology and water quality, cultural and paleontological resources, transportation and safety, air quality, noise and vibration, socioeconomics and environmental justice, recreation, aesthetics, and energy. Based on these considerations, the Board reasonably concluded that the TRRC projects would not result in cumulative effects with respect to the nine approved CBM sites. Petitioners argue that this conclusion is far-fetched and belied by the record, but again fail to present evidence that contradicts the findings of the Board.

### c.   Air Quality and Wildlife

[4] Beyond their attack on temporal limitation, see *supra*, Petitioners argue that the Board failed to consider the cumulative effect of the CBM wells and the railroad on air quality and wildlife. We disagree.

The Board analyzed air quality assuming an operational railroad and concluded that such effects would be minor, particularly when mitigation measures are applied. The Board

considered two types of emissions that would affect air quality—fugitive dust emissions and combustion emissions. Fugitive dust emissions include wind-blown dust which could result from exposed soils from devegetation along the railroad right of way. The SEA estimated that 10% of the right of way would have exposed soils and estimated the emissions based on EPA emission factors. Fugitive dust emissions also include coal dust from traveling coal cars. Combustion emissions from the operation of the railroad locomotives were also considered using emission standards released by the EPA. The Board is afforded deference in choosing its scientific method for modeling data, and it chose to limit the scope to the Air Quality Control Region in Eastern Montana. *See Lands Council*, 537 F.3d at 988 (explaining that the court is not to impose its own scientific judgment on the agency); *id.* at 1000 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.") (citation and quotation marks omitted). Thus, Petitioners do not demonstrate how the Board here failed to take a "hard look," even if they did not include the air quality model preferred by Petitioners or air quality data from Wyoming.

[5] Additionally, the Board analyzed effects of construction and operation of the railroad and the CBM wells on wildlife and reasonably concluded that most of the effects were likely to occur during construction, rather than during operation of the railroad. For example, the Board found that most of the effects, including removal of vegetation and habitat, increased sedimentation, and loss of flood plain, are localized and temporary in nature. The EIS addresses these impacts and creates mitigation measures. Additionally, Petitioners do not cite any specific deficiencies in this analysis, but instead point to generalized wildlife cumulative impacts addressed in the Methane EIS for the entire state. Therefore, there is no basis

for finding this particular Board decision irrational, and it is entitled to deference.[5]

## 2.   Other Coal Mines

Petitioners further argue that the Board failed to address any cumulative impacts of the railroad with existing coal mines—in particular, the Ashland and Otter Creek Mines.

### a.   Ashland Coal Mines

[6] Petitioners contend that the Board also erred by relying on the analysis of the Ashland Mines from TRRC I when doing its analysis for TRRC II and III. Petitioners are correct that the TRRC I data was incorporated. Wholesale adoption of TRRC I's data into TRRC II and III could conceivably raise some questions because TRRC I pre-dated the other projects by many years, and the data could have changed in the meantime. However, the Board evaluated whether there would be any increases in coal production in the Ashland area mines for TRRC II and TRRC III. The Board concluded that no material changes are predicted, beyond those already analyzed in TRRC I. Accordingly, because coal production has remained stable, as noted in the TRRC I study, and was reevaluated for the two subsequent projects, the Board did not unreasonably continue to rely on the Ashland mines coal production conclusions in TRRC I in doing its analysis for TRRC II and TRRC III.

---

[5]This conclusion, however, is subject to the caveat that the Board lacks the requisite updated and baseline data as to wildlife. See *infra* Section I.B-C. Therefore, to the extent that the operations analysis overlaps with the lack of requisite data, the Board's no operation impact finding is arbitrary and capricious. Without the requisite data, the Board cannot come to the conclusion that the operations will not affect wildlife.

### b.  Otter Creek Coal Mines

However, we do not reach the same conclusion as to the Otter Creek mines. Petitioners argue that the Board failed to address any impacts from the Otter Creek mines, notwithstanding the fact that the financial justification for the entire line included hauling Otter Creek coal. The Board first responds that Petitioners have waived this argument because Petitioner Mark Fix agreed in comments sent to the Board that the Otter Creek development was unforeseeable. Second, the Board claims that mining development in Otter Creek was not reasonably foreseeable when the Supplemental EIS in TRRC III was completed. We disagree with both the Board's contentions.

Parties must alert an agency to their position and contentions. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). A party waives arguments that are not raised during the administrative process. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764-65 (2004). Here, however, Petitioner NPRC specifically commented that development of the Otter Creek coal mines must be addressed. Specifically, on December 6, 2004, NPRC stated that the DSEIS was deficient because:

> [i]n its preliminary determination that the TRR is in the public need, the [Board] relies, at least in part, on the development of coal tracts along Otter Creek and the development of coal-fired power plants near Ashland, Montana. The [Board] contends that the TRR is needed to provide a means of hauling coal from yet-to-be leased much less permitted coal tracts. Yet in the SDEIS, the [Board] concludes that the proposed coal mines and power plants are too speculative to be considered reasonably foreseeable future actions. Consequently, the [Board] failed to evaluate the potential cumulative impacts of this development on the human environment. This

[Board] decision is disingenuous, implausible, and a textbook example of arbitrary and capricious decision-making.

Earlier, on November 16, 2004, Petitioner Mark Fix told the Board that he did not see Otter Creek as foreseeable. However, in this case, the subsequent comment by Petitioner NPRC brought the issue to the Board's attention. The Board had notice of the concern and was afforded the opportunity to bring its expertise to bear. Thus, the argument is not waived.

**[7]** Moreover, the Board's own explanation that the Otter Creek mines were not foreseeable is arbitrary and capricious. The Board knew that in 2002 the federal government transferred the land to the State of Montana for coal development, and the DSEIS included a map with the sites of future coal mines. Even more significantly, the Board relied on the coal mine development in Otter Creek to justify the financial soundness of the proposal, since it included the tonnage forecasts in its 2007 final decision. We therefore hold that, because the Otter Creek mine was reasonably foreseeable at the time of TRRC III, the FSEIS violated NEPA by failing to address the mine's impacts.

### 3.  Water Quality

Petitioners' last cumulative effect argument is that the FSEIS does not analyze the combined effects of the railroad, CBM, and coal mines as to water quality. The Board responds that, because there is really no impact from CBM development (because construction will not occur simultaneously) and there are virtually no impacts from coal mine development (as mitigated), there are no effects to add to the virtually non-existent impact on water quality from the railroad.

We agree with the Board that where a proposed project has "virtually no effect" on water quality, the agency is not required to examine cumulative impacts from other projects

because it would not provide an informed analysis. *See Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1140 (9th Cir. 2006). However, we disagree with the Board's analysis in this instance because it is largely based on the reasoning that the railroad construction will not occur simultaneously with the construction of the CBM wells. This argument does not address the concern expressed above, see *supra* Section I.A.1.a, that there may well be simultaneous construction. Construction of the railroad is estimated to increase sentiment loading in the Tongue River. Thus, were simultaneous construction to occur, the Board must address this water quality issue. The Board also fails to address the cumulative effects of railroad construction combined with the water quality degradation from operational CBM wells, which are estimated to be substantial.

The Board's position is more persuasive as it relates to operation of the railroad, since the railroad is not expected to discharge water during operation. Mitigation measures such as revegetation are estimated to reduce the sediment delivery during operations to "near zero."

**[8]** Accordingly, we hold that the Board's FSEIS in TRRC III is deficient as to its water quality analysis related to construction, but sufficient as to operations. Furthermore, because the Board failed to account for the Otter Creek coal mines, the Board should perform cumulative water quality analysis, taking this reasonably foreseeable project into account on remand.

### B.    Adequacy of the Baseline Data

**[9]** Petitioners also contend that the TRRC II and III EIS documents do not provide adequate baseline data to assess the impacts of the railroad.[6] Petitioners take issue with the

---

[6]While Petitioners' brief argues that TRRC II's baseline data is insufficient, Petitioners specific arguments do not refer to the TRRC II EIS.

Board's analysis concerning the pallid sturgeon, sage grouse, fish and aquatic resources, other wildlife, and sensitive plants. Because the TRRC III FSEIS does not provide baseline data for many of the species, and instead plans to conduct surveys and studies as part of its post-approval mitigation measures, we hold that the Board did not take a sufficiently "hard look" to fulfill its NEPA-imposed obligations at the impacts as to these species prior to issuing its decision.

NEPA requires that the agency provide the data on which it bases its environmental analysis. *See Lands Council*, 537 F.3d at 994 (holding that an agency must support its conclusions with studies that the agency deems reliable). Such analyses must occur before the proposed action is approved, not afterward. *See LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988) ("[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action.") (internal citation and quotation marks omitted). "[O]nce a project begins, the 'pre-project environment' becomes a thing of the past" and evaluation of the project's effect becomes "simply impossible." *Id.*

Petitioners cite the pallid sturgeon as an example of a wildlife resource with insufficient baseline data. The pallid sturgeon was listed in 1990 as being endangered throughout its range by the U.S. Fish and Wildlife Service (FWS). During the EIS process for TRRC III, the FWS submitted comments to the Board indicating that the Board failed to determine

---

Instead, all specific arguments regarding the various species missing baseline data refer us to the TRRC III EIS process. Accordingly, our discussion and conclusion is largely limited to the TRRC III EIS process. However, to the extent that the data presented in TRRC III is a wholesale adoption of the data from the TRRC II EIS, the discussion and conclusion applies to that portion of the TRRC II EIS as well.

whether vibrations and noise from the railroad would be harmful to the fish at a nearby hatchery. The TRRC had hired an engineering firm, Womack & Associates, Inc. (Womack) in 1998 to study the effects of the railroad at the Miles City Fish Hatchery, with supplemental reports being prepared in 2004 and 2006. The FWS, however, disagreed with the analysis by Womack and expressed interest in doing its own studies as needed to assure that there would be no impacts from the construction and operation of the TRRC railroad.

As the TRRC III decision itself recognized:

> As set out in the SEIS, the parties also have had a number of discussions on the potential vibration issues. [FWP] has asked the applicant to conduct additional baseline studies to more fully understand the potential long-term effects that vibration may have on the fish. *TRRC is concerned that long-term studies of the sort [FWP] has sought could significantly delay its construction schedule.* However, in April 2006, the railroad agreed to implement a work plan (included as Appendix G to the Final SEIS) for additional vibration monitoring at the hatchery.

The work plan, implemented as a mitigation measure, was developed by Womack and the noise and vibration program would include measurements and analysis to "[m]easure baseline conditions at the [Miles City Fish Hatchery]," to "[p]redict and assess future sound pressure levels from construction and operation of the TRR near the [Miles City Fish Hatchery] and compare to baseline conditions," and to "[m]easure actual noise and vibration during the construction and operation of the TRR to compare actual levels to predicted levels."

Similarly, as to sage grouse, the only data the Board collected was the number of acres of potential sage grouse habitat within the 200-foot railroad right of way. The BLM

submitted comments to the Board indicating that there was insufficient information as to the sage grouse:

> With the increasing importance of sage grouse, more discussion on sage grouse is needed, including discussion on wintering areas and impacts of West Nile virus on sage grouse. Need to check statewide data base for more information on sage grouse strutting grounds which have been found in the past few years. . . . Sage grouse inventories need to be conducted at least two miles from any proposed disturbance.

In response, the Board agreed to conduct sage grouse surveys at least two miles from the proposed disturbance as a mitigation measure and that "pre-construction surveys would be conducted to determine the extent of sage grouse habitats and activity in the project area." Further, the Board acknowledged that "[l]ocations of leks [communal grounds used by the grouse for courtship, breeding, and wintering] from Birney to the terminus of the proposed Western Alignment at the Spring Creek spur are not well known, so potential impacts on grouse in this portion of the line are difficult to determine." However, in response to the BLM's comments, the Board did not collect this data before approval of the railroad application and instead instituted mitigation measure 26 to conduct surveys on sage grouse at a later date.

Finally, as to fish and aquatic resources, other wildlife, and sensitive plants, Petitioners also contend that baseline data is only being gathered as part of mitigation measures. For fish, mitigation measure 34 purports to "conduct a three-part study plan to identify aquatic resources" by conducting a fish and fish habitat survey to "estimate population and to monitor potential mortality or emigration due to construction impacts." For other wildlife, other mitigation measures call for data reconnaissance to "locate habitat areas and nesting sites" for several species of animals for the entire rail line. For

plants, the SEA was unable to conduct ground-level surveys to identify which state and federally protected plant species existed along the railroad's right of way. Thus, the Board prepared a mitigation measure to conduct a field search to "identify plant species of concern (Federal and state) and to implement appropriate mitigation measures during construction activities if such species are found."

**[10]** We recognize the Board's extensive mitigation efforts. However, such mitigation measures, while necessary, are not alone sufficient to meet the Board's NEPA obligations to determine the projected extent of the environmental harm to enumerated resources *before* a project is approved. Mitigation measures may help alleviate impact *after* construction, but do not help to evaluate and understand the impact before construction. In a way, reliance on mitigation measures presupposes approval. It assumes that—regardless of what effects construction may have on resources—there are mitigation measures that might counteract the effect without first understanding the extent of the problem.

This is inconsistent with what NEPA requires. NEPA aims (1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Robertson*, 490 U.S. at 349; *N. Idaho Cmty. Action Network*, 545 F.3d at 1153. The use of mitigation measures as a proxy for baseline data does not further either purpose. First, without this data, an agency cannot carefully consider information about significant environment impacts. Thus, the agency "fail[s] to consider an important aspect of the problem," resulting in an arbitrary and capricious decision. *See Lands Council*, 537 F.3d at 987 (citation omitted). Second, even if the mitigation measures may guarantee that the data will be collected some time in the future, the data is not available during the EIS process and is not available to the public for comment. Significantly, in such a situation, the EIS process cannot serve its larger informational role, and the public is deprived of their

opportunity to play a role in the decision-making process. *See Robertson*, 490 U.S. at 349. While the Board must prepare a detailed statement on "any adverse environmental effects which cannot be avoided should the proposal be implemented," 42 U.S.C. § 4332(C)(ii), this requirement does not contravene the Board's other obligation to ensure that data exists *before approval* so that the Board can understand the adverse environment effects *ab initio*.

The Board responds that it was unable to conduct some of the surveys due to the rough terrain in the area, and that it was unable to access some portions of the land in order to conduct the surveys because the access points were on private property. We are unpersuaded that these excuses can relieve the Board of its requirement under NEPA to gather information before it can make an informed decision. The Board presented no evidence indicating that it even attempted to contact any private land owners about gaining access to their land to conduct the surveys. As to rugged terrain, the Board does not explain how waiting until post-approval mitigation to conduct the survey alleviates this issue.

[11] Had the Board attempted to obtain the baseline data for these plants and wildlife through some scientific study or methodology that its experts deemed reliable, we would evaluate the situation from a different perspective. After all, we do not "act as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988. The problem here, however, is that the Board did not collect this data in the first place, and was therefore unable to consider it during the EIS process. We hold that the Board violated NEPA by not taking a sufficiently "hard look" when it deferred gathering baseline data discussed in this Section I B.

## C.   Stale Data

Petitioners also contend that the Board relied on stale data in making its TRRC III environmental impacts analysis.

Board admits that it was unable to conduct on-the-ground surveys as part of the EIS process. The Board cites the rough terrain, rural location, and limited access due to private property as the reasons that it was unable to conduct on-the-ground surveys. The Board instead relied on aerial surveys and photography, along with data from TRRC I and TRRC II. We agree with Petitioners that the Board's reliance on this data does not constitute a "hard look" under NEPA.

**[12]** Many of the aerial surveys relied upon were conducted many years ago—in 1985 for TRRC 1, in 1992 for TRRC II, and in 1997 for TRRC III. At the time of the 2007 decision in TRRC III, even the most recent aerial survey was ten years old. Reliance on data that is too stale to carry the weight assigned to it may be arbitrary and capricious. *See Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (finding that six-year-old data, without updated habitat surveys, was too stale). For the reasons *infra*, we find the Board's reliance on stale aerial surveys was arbitrary and capricious under the circumstances in this case.

The Board contends that it is entitled to rely on this outdated data because "the physical environment of the area at issue here is substantially the same." However, the Board does not cite any scientific studies or testimony in the record that supports this conclusion. *See Lands Council*, 537 F.3d at 994. Moreover, even assuming this was true, we fail to understand how this necessarily and logically leads to the conclusion that the information regarding habitat and populations of numerous species remains the same as well.

The Board also did not adequately update the aerial surveys with more recent data. The Board's 2004 helicopter surveys were limited to black-tailed prairie dog colonies and bald eagle wintering and nesting sites. The Board also contends that it conducted site visits, including one in 2003. However, these site visits were conducted from the local public roads. The Board has acknowledged that much of the TRRC railroad

line would traverse private property that is not near public roads. The Board fails to explain how its surveys from the public roads allowed it to adequately update the resource data when it admits that much of the prospective railroad land is not even accessible from public roads.

**[13]** Given the dearth of other data in this case, the Board fails to show that its reliance on several-years-old aerial photographs can support its conclusions. The Board's decision, citing *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003), contends that environmental surveys often use aerial photography and aerial surveys. In *Mid States Coalition*, the Board used aerial photographs to identify noise-sensitive receptors—which was defined as any residence. 345 F.3d at 538. The objection raised was that a single building that could be identified via the aerial photograph could in fact contain multiple residences. *Id.* The Eighth Circuit held that the agency is not required to maximize precision at all costs and the method used was a reasonable way to approximate the number of affected receptors. *Id.* The use of the aerial photographs in *Mid States Coalition* stands in stark contrast with its use by the Board in TRRC III. Here, the Board purported to use aerial photographs and surveys to identify habitats and populations of fish, plants, and other wildlife. The Board fails to cite to any explanation in the record of what reliable methodology allowed it to determine the population of fish in rivers or identify sensitive plant species from these aerial surveys. We do not conclude that an agency cannot rely on aerial surveys in certain situations for studying habitats and populations. However, in this case, we find it inherently illogical to credit the evidence the Board has submitted to support its conclusion that the aerial surveys conducted were sufficient to establish the habitat and population for the numerous plants and wildlife potentially at risk.

**[14]** In summary, the Board relied on stale data during the environment impact analysis process of TRRC III and failed

to properly update the data with additional studies and surveys. We hold that such faulty reliance does not constitute the "hard look" required under NEPA.

### D.   Geographic Scope

Petitioners also argue that the Board improperly limited the geographic scope of the Board's direct impacts analysis and focused only on the railroad's right of way (ROW). "The task of selecting the geographic boundaries of an EIS requires a complicated analysis of several factors, such as the scope of the project considered, the features of the land, and the types of species in the area." *Selkirk*, 336 F.3d at 958. The determination of the geographic boundary where environmental impacts may occur is often "a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

**[15]** The Board did not arbitrarily limit the geographic scope to the railroad's ROW. The impact analysis was limited to the area surrounding the ROW for the study of land use, noise and vibration, and cultural resources because these disturbances are limited and not expected to travel far. For each resource, the Board determined the scope of its impact analysis—for example, 300 meters on each side of the center of the ROW for soil surveys and 1,500 feet on each side of the center of the ROW for cultural resources. For other resources such as fish and wildlife, however, the Board did not limit the scope to the area surrounding the ROW. Some studies the Board reviewed covered a 6,000-square-mile area for mammals and birds and another covered a 7,500-square-mile area for birds. Further, for water and air quality analysis, the Board's review was not limited to the ROW and covered much more of the neighboring area. We hold that the Board did not err in limiting the scope of the studies.

### E.   Single EIS

Petitioners also claim that the Board erred by not creating a single comprehensive EIS to cover the various TRRC appli-

cations. Petitioners contend that a single EIS is required because the TRRC applications were closely related, and under the regulations, should be discussed under a single impact statement. *See* 40 C.F.R. § 1508.25(a)(1) ("Connected actions . . . should be discussed in the same impact statement.").

Actions are "connected" if they "[c]annot or will not proceed unless other actions are taken previously or simultaneously." 40 C.F.R. § 1508.25(a)(1)(ii). We have explained that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 998 (citing 40 C.F.R. § 1502.4(a)). "The purpose of this requirement is to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006) (citation and quotation marks omitted). In determining whether there is a connection between projects, this circuit employs an "independent utility" test. *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir. 2000), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). The test asks whether "each of two projects would have taken place with or without the other." *Id.* (citation omitted). If the answer is yes, then the projects have "independent utility" and do not require the same EIS. *Id.* "To prevail, plaintiffs must show that [the agency] was arbitrary and capricious in failing to prepare one comprehensive environmental statement." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002) (citing *Kleppe*, 427 U.S. at 412).

Petitioners argue that all the projects lack independent utility. In particular, because TRRC II and TRRC III connect to TRRC I on one end, neither railroad would lead anywhere without TRRC I. Conversely, the Board argues that the proj-

ects should not be considered as one single project, because TRRC II and TRRC III were additions and modifications to the TRRC I project. The Board contends that it had no way of knowing, at the time of TRRC I, that TRRC II or TRRC III would be later proposed. Thus, the Board contends that it did what was required of it, and supplemented the EISs for TRRC II and TRRC III to consider the impact of the entire railroad line.

**[16]** Both parties make thought-provoking arguments. However, the timing of the TRRC applications precluded them from being filed as a single EIS. The railroad approved in TRRC I had independent utility in and of itself. The TRRC II and TRRC III applications do not have much utility outside of TRRC I. Nevertheless, when the Board approved TRRC II and TRRC III, it did incorporate the findings of the previous EISs and looked at the total environmental impact of the entire 130-mile railroad line even though it did not prepare one single comprehensive EIS. While we hold that the Board's EIS preparation is arbitrary and capricious in other ways, see *supra* Section I.A-C, we do not find that its incorporation of the previous EISs is *per se* in error for reasons already discussed. In other words, we believe that the Board's method of incorporating the EISs—which considered the entire railroad line—may have been appropriate had it cured the other deficiencies cited *supra* in Section I.A-C.

## F.   Tiering

**[17]** Petitioners' final argument is that the Board violated NEPA when it tiered its EIS to five other site-specific EISs. Tiering is the process of incorporating by reference coverage of general matters in broader environmental impact statements, such as national program or policy statements, into subsequent narrower environmental analysis, such as site-specific statements. 40 C.F.R. § 1508.28. Tiering under NEPA is permitted in two circumstances: (1) "a program, plan, or policy impact statement" may be tiered to "a pro-

gram, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis," and (2) "an environmental impact statement on a specific action at an early stage" may be tiered "to a supplement . . . or a subsequent statement or analysis at a later stage." *Id.* § 1508.28(a), (b). Only documents that have undergone NEPA analysis may be tiered. *Kern*, 284 F.3d at 1073.

**[18]** The Board contends that it did not impermissibly tier any other site-specific EISs but relied on the EISs only for general background information. We agree. In the TRRC III FSEIS, the Board stated:

> Additionally, the Tongue River region has been studied extensively, not only by SEA in conducting the environmental analysis for Tongue River I and Tongue River II, but also by BLM and MT DNRC in the preparation of EISs for Powder River I, Montco Mine, CX Ranch, and the Tongue River Reservoir Dam reconstruction, as well as the analysis of coal-bed-methane-production wells. Where appropriate, SEA has relied on these other environmental analyses.

The Powder River I, Montco Mine, CX Ranch, Tongue River Reservoir Dam, and coal-bed-methane production wells EISs are site-specific EISs that do not fall into either situation where tiering is permitted. However, Petitioners fail to explain what aspect of the TRRC environmental analysis directly relies on the incorporation of these other EISs. Thus, we reject Petitioners' contention that the Board engaged in illegal tiering.

To summarize our holdings in Section I, we reverse and remand on (1) the Board's cumulative impact analysis in TRRC III as to the reasonably foreseeable coal bed methane projects, the Otter Creek Coal Mine, and water quality analysis; (2) the adequacy of the baseline data in TRRC III as to

the pallid sturgeon, sage grouse, fish and aquatic life, other wildlife, and sensitive plants; and (3) the Board's reliance on stale data, consistent with the analysis outlined above in Section I. We affirm the Board as to Petitioners' other environmental claims.

## II.  Railroad Claims

### A.  The 49 U.S.C. § 10901 Standard

Petitioners contend that the Board did not apply the correct statutory standard when it granted permission to construct the rail lines in TRRC II and TRRC III. We disagree.

[19] 49 U.S.C. § 10901 governs when the Board may authorize the construction and operation of railroad lines. As the statute existed prior to 1980, the Board could authorize construction of a rail line only if it found that "the present or future public convenience and necessity *require or will be enhanced by* the construction or acquisition (or both) and operation of the railroad line." 49 U.S.C. § 10901 (1976) (emphasis added). The Staggers Act of 1980 changed the language to authorize construction of a rail line if the Board finds that "the present or future public convenience and necessity *require or permit* the construction or acquisition (or both) and operation of the railroad line." 49 U.S.C. § 10901 (1980) (emphasis added).

#### 1.  TRRC II

TRRC II was submitted to the Board in 1989. In its decision approving the construction, the Board reasoned that the Staggers Act amended Section 10901 to relax the burden on railroad companies because construction could be granted as long as public convenience and necessity "permit" the construction, whereas public convenience and necessity must have "required" or "be enhanced" by the construction prior to 1980. Petitioners argue that this interpretation was erroneous.

They contend that the Staggers Act amendment aimed only to "harmonize" the standard between Section 10901 governing construction of railroads with Section 10903 governing abandonment of railroads.

To the extent Petitioners argue that the Staggers Act worked to "harmonize"—i.e., to bring into agreement—the language for when a railroad can be abandoned and when a railroad can be constructed, we agree. However, we fail to see why this harmonization necessarily forecloses Congress's intent to lower the standard for railroad construction to match the standard for railroad abandonment.

Nothing in the history of textual changes to the statute compels the conclusion that the standards for construction and abandonment were historically ever in sync, at least until the passage of the Staggers Act. When Congress passed the Transportation Act of 1920—giving the ICC authority over railroad construction and abandonment—the statute called for construction of railroads when "present or future public convenience and necessity *require or will require*" the construction and abandonment when "present or future public convenience and necessity *permit*" the abandonment. Transportation Act of 1920, 41 Stat. 477-78, Section 402, ¶ 1(18). The Railroad Revitalization and Regulatory Reform Act of 1976 separated the two standards into different sections of the Code, and called for construction when "present or future public convenience and necessity *require or will be enhanced by*" the construction and abandonment when "present or future public convenience and necessity *require or permit*" the abandonment. 49 U.S.C. §§ 1(18)(a), 1a(1) (1976). These two sections were not harmonized until the 1980 Staggers Act, which called for construction or abandonment when "the present or future public convenience and necessity *require or permit*" the construction or abandonment. 49 U.S.C. §§ 10901, 10903 (1980).

Petitioners have a different view of what it means to "harmonize" the standards. Instead of construing the change in

language as bringing the two standards into agreement, they argue that the Staggers Act aimed to restore the traditional standards which were in place prior to 1976. Neither the plain language of the statute nor the legislative history supports this assertion.

[20] The change in language in Section 10901 from allowing construction if the public convenience and necessity "require or *will be enhanced by*" the proposed construction to allowing construction when public convenience and necessity "require *or permit*" the proposed construction signals that Congress intended to relax the policy concerning railroad construction. Indeed, the Eighth Circuit also has concluded as much:

> As first enacted, § 10901 directed the [Board] to approve a project only if public convenience and necessity 'require or will be enhanced by' the construction. Congress subsequently relaxed this restrictive policy by providing that the [Board] need only find that public convenience and necessity 'permit' the proposed construction.

*Mid States Coalition*, 345 F.3d at 552 (8th Cir. 2003) (internal citations omitted). Furthermore, this relaxed standard is consistent with the legislative history of the Act. Specifically, the conference report states that:

> The Senate Bill changes existing law to *permit easier entry*, consistent with the policy of this Act to encourage greater reliance on marketplace forces than on government regulation. Under present law, the Commission may authorize the construction of a railroad only if it finds that the public convenience and necessity 'require or will be enhanced' by the construction. *This is a more stringent test than that applied to either the abandonment of rail lines or mergers. There does not appear to be any reason*

*why the Commission should apply a more difficult standard for the construction of new facilities than for the abandonment of old facilities.* The Senate Bill changes the test applied by the Commission from 'require or will be enhanced' to 'require or permit'.

H.R. Conf. Rep. 96-1430, P.L. 96-448, Staggers Rail Act of 1980, 115 (1980) (emphasis added). Thus, we conclude that the Board did not misinterpret the standard under § 10901 in rendering its decision on TRRC II.

## 2.  TRRC III

In 1995, Congress further amended 49 U.S.C. § 10901 with the passage of the ICCTA, to read as follows:

The Board *shall* issue a certificate authorizing activities for which such authority is requested in an application filed under subsection (b) *unless* the Board finds that such activities are *inconsistent with* the public convenience and necessity.

49 U.S.C. § 10901 (1996) (emphasis added). The TRRC filed an application for the 17.4-mile Western Alignment known as TRRC III in 1998.

**[21]** Petitioners contend that the pre-1996 § 10901 should apply to TRRC III even though it was filed in 1998, due to the ICCTA's savings clause. The savings provision of the ICCTA states that any proceeding or application that is pending before the ICCTA's effective date (generally, January 1, 1996) shall be continued and unaffected and review shall be taken as if the ICCTA was never enacted. ICCTA, Pub. L. No. 104-88, § 204, 109 Stat. 803, 941 (1995) (codified at 49 U.S.C. § 701 Note). Petitioners argue that TRRC III should be covered by the savings provision because the TRRC originally tried to reopen TRRC II for the 17.4-mile Western Alignment alternative. Petitioners also argue that the Board

considered TRRC III supplemental to TRRC II from an envi-
ronmental standpoint. We disagree with both contentions.

**[22]** TRRC II and TRRC III were separate proceedings.
TRRC III was filed in 1989 and clearly was not "pending"
before the ICCTA took effect on January 1, 1996. Further,
Petitioners fail to show how the Board may have abused its
discretion in treating the TRRC's application for the Western
Alignment as a new application. A final agency decision in
TRRC II had already been issued on October 28, 1996.**[7]**
Rather than reopen those proceedings, the Board asked TRRC
to file a new proceeding and the Board correctly applied the
version of Section 10901 that was in place at that time.

Second, Petitioners argue that even if the post-ICCTA ver-
sion of Section 10901 was applicable, the Board impermiss-
ibly read into the standard a presumption that construction
should be approved. Petitioners argue that this presumption
was not the intent of Congress, and that the Board cannot read
it into the statute.

**[23]** Review of the Board's decision in TRRC III does not
indicate that an impermissible presumption was read into the
statute. We start with the plain language of the statute. *See
Pension Benefit Guar. v. Carter & Tillery Enters.*, 133 F.3d
1183, 1185-86 (9th Cir. 1998). The plain language of the
post-ICCTA Section 10901 states that applications "shall" be
approved "unless the Board finds that such activities are
inconsistent with the public convenience and necessity." This
language loosens the prior standard, which allowed approval
only when public convenience and necessity "required or per-

---

**[7]**We note that TRRC II was also decided after the January 1, 1996 effec-
tive date of the ICCTA. However, TRRC II does fall within the ICCTA
savings clause, discussed *supra*, because it was filed in 1989 and was
pending when the ICCTA was enacted. Thus, the law that applies to the
TRRC II application is the law in effect prior to the enactment of the
ICCTA. *See* ICCTA, Pub. L. No. 104-88, § 204, 109 Stat. 803, 941 (1995)
(codified at 49 U.S.C. § 701 Note).

mitted" the construction. The Board's construction of this statute is reasonable and consistent with the Eighth Circuit's interpretation:

> Congress's latest iteration of the statute relaxes the standard even further, directing that the Board "shall issue" construction licenses, "unless the Board finds that such activities are *inconsistent* with the public convenience and necessity." 49 U.S.C. § 10901(c) (emphasis added). When read in conjunction with Congress's broad policy directives to promote "effective competition among rail carriers" and to "reduce regulatory barriers to entry into . . . the industry," 49 U.S.C. § 10101, we believe that the Board correctly maintains that there is a statutory presumption that rail construction is to be approved.

*Mid States Coalition*, 345 F.3d at 552. We agree with the Eighth Circuit and the Board's interpretation, and find the Board did not improperly apply a presumption for construction in TRRC III.

## B.   The Board's Public Convenience and Necessity Findings

Petitioners also challenge the Board's findings regarding public convenience and necessity and whether the findings are supported by the record.

### 1.   The Public Convenience and Necessity Test

Petitioners first challenge the test that the Board applied to evaluate "public convenience and necessity." In TRRC II, the Board formulated the following test for public convenience and necessity:

> The transportation issues that are raised in rail entry cases include: (1) whether the applicant is fit, finan-

cially and otherwise, to undertake the construction and provide rail service; (2) whether there is a public demand or need for the service; and (3) whether the competition would be harmful to existing carriers.

While Petitioners acknowledge that the test includes three factors and that the Board's use of the word "include" in the test indicates that other factors may be considered, they contend that the Board only considered the three factors in subsequent cases. In any event, Petitioners claim that the test described varies from the test for public convenience and necessity that has been used traditionally.

The parties agree that Congress did not define public convenience and necessity. *See I.C.C. v. Parker*, 326 U.S. 60, 65 (1945). Citing *Public Convenience Application of Utah Terminal Ry.*, 72 ICC 89, 93-94 (1922), Petitioners argue that the Board has previously defined the term as a "strong or urgent public need." However, since then, it appears that the Board historically has "draw[n] its conclusion from the infinite variety of circumstances which may occur in specific instances." *N.M. Navajo Ranchers Ass'n v. I.C.C.*, 702 F.2d 227, 232 (D.C. Cir. 1983) (quoting *Parker*, 326 U.S. at 65).

We are not persuaded that the Board erred in considering the factors it did in making its TRRC II decision. Petitioners fail to explain how the test—under these specific circumstances—was unreasonable. In particular, Petitioners do not cite any additional factors the Board should have considered that would affect public convenience and necessity. Further, the Board has traditionally looked to a "variety of circumstances," and the Supreme Court has confirmed that the Board has discretion to do so. *See Parker*, 326 U.S. at 65 ("The Commission has assumed, as its duty under these earlier subsections, the finding of facts and the exercise of its judgment to determine public convenience and necessity. This Court approved this construction.").

The Petitioners also fail to show that the Board erred in considering the factors it did in making the TRRC III decision. In that decision, the Board applied the following test:

> [T]he agency has traditionally looked at whether: (1) the applicant is financially able to undertake the project and provide rail service; (2) there is a public demand or need for the proposed service; and (3) the proposal is in the public interest and will not unduly harm existing services. The agency accords the interests of existing shippers substantial importance in assessing the [public convenience and necessity] in railroad construction proceedings.

Petitioners argue that the inclusion of the "public interest" in this test somehow lessened the public convenience and necessity standard. We disagree. The public interest was one of many factors the Board considered and analyzed that, taken together, constituted their consideration of public convenience and necessity for the construction of the railroad.

**[24]** We conclude that the Board did not err in considering the factors it did in analyzing the public convenience and necessity standard of Section 10901.

## 2. TRRC's Financial Fitness

Petitioners' next argument is that, assuming that the factors the Board considered were correct, the Board's conclusion as to each factor was not supported by the record. Petitioners first contend that the Board did not properly consider TRRC's financial fitness. The Supreme Court has elaborated on the purpose behind this factor:

> Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources,

of individual carriers, is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources, and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public, as well as in benefit; and that, when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss.

*Texas & P. Ry. Co. v. Gulf, C. & S.F. Ry. Co.*, 270 U.S. 266, 277 (1926). Petitioners claim that the Board must consider the effect on the public and carriers as part of this test.

[25] While we agree with Petitioners that the Board should consider the protection of the public, the carriers, and existing shippers, we conclude that the Board adequately weighed these issues. Petitioners argue that the Board's decision focused only on protecting service for existing shippers and not on protecting the TRRC and its investors. The Board first noted that the effect on existing shippers would be small because there were no current TRRC shippers and any shippers TRRC may service in the future are at liberty to return to using the longer BNSF route if necessary. The Board next evaluated the financial fitness of the TRRC. Based on a review of data submitted, the Board concluded that the TRRC was financially fit and able to construct the line and sustain operations and service. Petitioners submitted no evidence to refute this finding.

[26] Similarly, as to TRRC III, the Board performed a detailed financial analysis, taking into account construction costs, financing, and operating revenues. The Board considered the objections raised by Petitioners at that time, and performed a reasoned analysis. Petitioners argue that the Board evaluated the TRRC's financial fitness under too liberal a standard, but they do not contest any specific Board calculations, nor do they explain why the analysis fails under their

perceived more-stringent standard. We affirm the Board's findings concerning the financial fitness of both TRRC II and TRRC III.

### 3.　Clear Public Need or Demand

**[27]** Petitioners also argue that the Board misapplied the public need or demand factor in both TRRC II and TRRC III. Petitioners assert that the Board did not consider whether the need could be adequately met by the existing BNSF road, and complain that no existing shippers currently using BNSF wrote to support TRRC's application. However, in both its TRRC II and TRRC III decisions, the Board cited support for the project from a variety of sources, including coal producers, public utilities, and dairy farmers, who favored the project for its reduced transportation costs, as well as several Montana state officials, who favored the project because of increased employment and development and a broadened tax base. Petitioners do not cite to any authority, or explain why the public demand and needs of these parties are not properly considered over the needs of existing shippers. We hold that the Board did not err in concluding that there is a clear public need or demand for the railroad.

### 4.　Harm to Existing Carriers

Finally, Petitioners argue that the Board misapplied the harm to existing carriers factor in granting both TRRC II and TRRC III. Petitioners contend that the Board should have not only considered direct harms to the TRRC's competitors—BNSF as to TRRC II and Dakota, Minnesota & Eastern Railroad Corporation (DM&E) as to TRRC III—but also should have considered possible harm to the communities that rely on the operation of the competitors. As an initial matter, Petitioners do not cite any authority supporting their claim that the Board must consider harmful effects other than those to direct competitors under this factor. *See*, *e.g.*, *Indiana & Ohio Ry. Co.—Construction and Operation*, 9 I.C.C. 2d 783, 794

(1993). Furthermore, the Board addressed some of these concerns in its public interest section, which we will discuss *infra*, in Section II.B.5.

**[28]** In TRRC II, the Board concluded that BNSF's direct interests would not be harmed significantly because its railroad's only overlap with the TRRC railroad constitutes a small segment of the total haul. In TRRC III, the Board concluded that DM&E's direct interests would not be significantly harmed here because the DM&E and TRRC lines would serve different customers and transport different types of coal. Because BNSF actively supported TRRC in its TRRC III application, we do not find that the Board erred in failing to address the competitive harm to BNSF in TRRC III. Accordingly, the Board was not arbitrary and capricious in its harm to competitors findings.

### 5. Public Interest

In addition to the factors addressed *supra*, the Board also considered the public interest in its public convenience and necessity analysis. In particular, the Board considered (1) the loss of railroad jobs, (2) loss of mining jobs, (3) harm to ranchers, and (4) Native American interests. After examining each factor, the Board found that TRRC III would be in the public interest. The Board concluded that any lost jobs would be offset by new jobs created by the construction and operation of the new rail line, that the construction would foster the development of new mines and increase mining jobs, that ranchers would be adequately compensated for their lands, and that the TRRC will adhere to a Programmatic Agreement developed with the Native American interests in mind.

Petitioners object to this public interest analysis on procedural grounds. Indeed, Petitioners do not contest the Board's actual findings regarding the public interest. Instead, Petitioners argue that the Board primarily relied on environment documents in making its determination, and that the environment

proceedings are conducted in a different manner from those where a public convenience and necessity determination is made.

**[29]** When conducting a public convenience and necessity test, the Board may "draw its conclusion from the infinite variety of circumstances which may occur in specific instances." *N.M. Navajo Ranchers*, 702 F.2d at 232 (quoting *Parker*, 326 U.S. at 65). Thus, consideration of the public interest is permissible under this test. While Petitioners object to the evidence that the Board considered in its analysis, Petitioners fail to identify how they are prejudiced by the way the Board conducted its analysis. Moreover, they do not claim that they were barred from submitting the testimony of any witnesses or reports for the consideration of the Board. Based on the record before us, we conclude that the Board did not act arbitrarily or capriciously in addressing this issue.

## C.   Transportation and Environmental Division

In TRRC II, after the Board made its public convenience and necessity determination, the Board balanced the transportation concerns with environmental concerns. Petitioners argue that the Board's balancing analysis violated 49 U.S.C. § 10901 because some factors considered "environmental" should have actually been considered under the traditional public convenience and necessity analysis. In particular, Petitioners contend that the railroad employee concerns and Native American issues should have been handled under traditional public convenience and necessity analysis.

As an initial matter, we note that Petitioners' argument contradicts its position in TRRC III that these factors are not properly considered under the public convenience and necessity test. *See supra* Section II.B.5. As we previously noted, we agree with Petitioners' position that these factors may fit more into a traditional public convenience and necessity analysis. However, as applied to TRRC II, Petitioners fail to show that

the Board's treatment of these factors under its environmental label led to an arbitrary or capricious finding.

As to railroad employees, the Board found that, at most, 57 BNSF railroad employees would be displaced by TRRC II. The Board found that TRRC would have to hire 64 employees to operate the new railroad. Thus, the Board concluded that the construction and operation of TRRC II would result in a net employment gain for railroad employees.

The Board addressed the Native American issues extensively during the development of the EIS. In its Notice of Availability of Draft Environmental Impact Statement, the Board dedicated over 20 pages evaluating the project's impacts to the Northern Cheyenne Indian Reservation and the Crow Indian Reservation. The Board's evaluation included socio-economic effects, as well as impact on tribal cultural values and religious practices.

[30] Petitioners fail to explain how the Board's treatment of these issues is insufficient simply because the analysis was conducted as part of the Board's environmental analysis. Petitioners cite no contradictory evidence in the record disputing the Board's findings, nor do the Petitioners articulate why the Board's decision regarding the public convenience and necessity analysis would have been different if the Board had used different procedural approaches. Thus, we conclude that the Board's treatment of these factors was not arbitrary and capricious.

### D.  Lack of an ALJ decision

Petitioners argue that the Board's decision in TRRC II should be set aside because the Board should have permitted an administrative law judge (ALJ) to issue the initial decision. After an ALJ conducted the hearings in TRCII, the Board's predecessor, the ICC, set the application for hearing pursuant to 49 C.F.R. § 1150.10(g).

49 U.S.C. § 10327 sets the time line for "a division, individual Commissioner, employee board, or employee designated under Section 10305 of this title to make an initial decision." 49 U.S.C. § 10327(b) (1994).[8] This requirement for initial decision under Section 10327 may be voided, however, by the Board "on a finding that the matter involves a question of Commission policy, a new or novel issue of law, or an issue of general transportation importance, or that it is required for the timely execution of its functions." *Id.* § 10327(c).

The Board reserves for itself consideration and disposition of "[a]ll investigations and other proceedings instituted by the Board, except as may be ordered in individual situations." 49 C.F.R. § 1011.2. 49 U.S.C. § 10305 permits the ICC to "delegate to a division, an individual Commissioner, an employee board, or an employee appointed under Section 3105 of title 5, a matter before the Commission for action." 49 U.S.C. § 10305(a) (1994).

Petitioners contend that the Board's assignment of the case for hearing before the ALJ effectively delegated the case. Petitioners argue that, therefore, the Board could forgo having the ALJ issue the initial decision only if it finds that doing so would enable timely execution of the agency's functions.

**[31]** Here, however, the Board never explicitly delegated authority to the ALJ to issue a decision pursuant to 49 U.S.C. § 10305. In particular, the Board notes that the ALJ's only express grant of authority was "to conduct an oral hearing in Montana or Wyoming and to certify the transcript of the hearing to us to assist us in deciding the case." "[U]pon completion of the record and consideration of the environmental impact, we will issue a decision." Thus, under 49 U.S.C. § 10327, the ALJ was not required to issue the initial deci-

---

[8]Neither Section 10327 or Section 10305 was preserved following the enactment of the ICCTA in 1995.

sion. Furthermore, the Board went on to state that the case was already protracted, and given the importance of the case, the Board decided that it was better on balance to have the Board issue the initial decision directly. We agree with the Board, and conclude that Petitioners fail to show that the Board's decision was not within its statutory authority.

### E.    Labor Finding under 49 U.S.C. § 10901(e)

As to TRRC II, Petitioners also argue that the Board's decision must be set aside because it failed to address labor protection for railroad employees. Petitioners seek protection for BNSF employees. The Board responds that it is not required to provide employee protection for non-applicant employees —including the BNSF employees.

When TRRC II was filed, Section 10901(e) provided that:

> The Commission *may* require *any rail carrier* proposing both to construct and operate a new railroad line pursuant to this section to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby *no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this title.*

49 U.S.C. § 10901(e) (emphasis added) (1994).[9] The plain language of the statute indicates that the Board has discretion whether to impose protections. *See Ry. Labor Execs.' Ass'n v. I.C.C.*, 914 F.2d 276, 278 (D.C. Cir. 1990) ("Thus, for transactions under section 11343, employee protection is mandatory, while under section 10901, it is discretionary."), cert. denied, 499 U.S. 959 (1991). Moreover, the Board gen-

---

[9]Even though TRRC II was decided post-January 1, 1996 on October 28, 1996, the ICCTA's revocation of Section 10901(e) does not apply to TRRC II due to the ICCTA's savings provision. *See supra* note 7.

erally does not impose labor protections unless "exceptional circumstances are shown." *Id.*

The Board also has consistently interpreted Section 11347's employee protection to apply only to the applicant railroad's employee—in this case, TRRC employees—and not to non-applicant railroads' employees, such as BNSF workers. *See id.* at 280 ("[T]he Commission's view that section 11347 does not require labor protection for employees of nonapplicant carriers like CNW is firmly supported by previous decisions in this and other circuits."); *see also Crounse Corp. v. I.C.C.*, 781 F.2d 1176, 1192-93 (6th Cir. 1986) ("Every court of appeals that has considered the question has concluded that section 11347 does not apply to employees not directly involved in the transaction."), cert. denied, 479 U.S. 890 (1986); *Missouri-Kansas-Texas R.R. Co. v. U.S.*, 632 F.2d 392, 411-12 (5th Cir. 1980), cert denied, 451 U.S. 1017 (1981).

**[32]** Here, Petitioners requested employee protection only for non-applicant BNSF employees. And, as previously noted, courts have consistently found that the protections of 49 U.S.C. § 11347 apply only to applicant employees. In light of Section 10109(e)'s explicit reference to the interests of the employees that would be established pursuant to Section 11347, we see no reason to read the two sections inconsistently.[10] Thus, we conclude that Section 10901(e)'s employee protections do not apply to non-applicant employees, such as the BNSF employees in this case. In addition, even if the provi-

---

[10]Petitioners cite *Railway Labor Executives Association v. I.C.C.*, 784 F.2d 959 (9th Cir. 1986), to argue that the Ninth Circuit has provided for protection for affected non-applicant employees. However, in that case, Northwestern Pacific Railroad Company (NWP) wanted to abandon its railroad line and sold the interests in the line to two acquiring companies. *Id.* at 960. The primary issue presented was whether labor conditions should be imposed on the vendor NWP and the two acquiring companies. *Id.* at 969. The opinion is not apposite because it does not address any difference between applicant versus non-applicant employees.

sion did apply, Petitioners have not shown that they could meet the "exceptional circumstances" standard.

## F.   Viability of TRRC II

Finally, Petitioners contend that we should set aside the Board's decision in TRRC II because even TRRC concedes that it is no longer viable from an operational and engineering standpoint. In TRRC II, the Board considered two alternative routes—the TRRC's "preferred route" and the Four Mile Creek Alternative. The TRRC offered the Four Mile Creek alternative at the request of the Board's SEA. The Board approved TRRC II, adopting the Four Mile Creek Alternative.

After the Board rendered its decision on October 28, 1996, TRRC filed a petition seeking to reopen the application on the basis that the Four Mile Creek Alternative presented serious operational issues, and was not viable. BNSF sought to intervene in the proceedings and supported TRRC's argument. The Board denied the motion to reopen TRRC II because it found that the TRRC could have presented evidence of any defects during the review period.

At the time it decided TRRC II, the Board's decision was not arbitrary and capricious. In responding to the Board's decision respecting the Four Mile Creek Alternative, TRRC argued that it was concerned about the 2.31 percent grade for loaded unit trains on the Four Mile Creek Alternative, and that the route is 10 miles longer than its preferred route. The Board acknowledged TRRC's concerns, but relied on the findings of the SEA that there were design and operating options that the TRRC could use to mitigate potential safety problems. The SEA also consulted with the Federal Railroad Administration (FRA), which concurred that the Four Mile Creek Alternative could be safely operated. Furthermore, the TRRC acknowledged that the line could operate, but that it would be faced with increased construction and operating costs. In a June 7, 1994 letter, the TRRC stated that it had

undertaken an exhaustive review of possible routings, and that its engineering consultants, who had studied the routings, concluded that the TRRC's preferred alignment and the Four Mile Creek Alternative were the only feasible options.

**[33]** Thus, the evidence in the record shows that prior to October 1996, when the Board issued its decision in TRRC II, the Board properly considered the evidence presented and concluded that even the TRRC agreed at that time that the Four Mile Creek Alternative could be safely operated, albeit at an increased cost. Any new evidence that the TRRC and BNSF put forth regarding the new safety concerns was not before the Board when it issued its TRRC II decision, and we do not consider such evidence in our review. *See, e.g.*, *Humane Soc. of the United States v. Locke*, 626 F.3d 1040, 1058 (9th Cir. 2010) ("As a general matter, judicial review of agency decisions is limited to the record considered by the agency in making its decision." (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973))). Thus, we hold that the Board did not act arbitrarily and capriciously in finding that the Four Mile Creek Alternative was viable when it rendered its decision in TRRC II.

**[34]** However, as Petitioners observe, the current viability of TRRC II may be important to the extent that the approval of the TRRC III application relied on the Board's TRRC II application as its "no-build" alternative. And unlike in TRRC II, by the time of the TRRC III application in 1998, the Board was aware of the safety, operational, and viability concerns that both the TRRC and BNSF had about the Four Mile Creek Alternative.

When the TRRC and BNSF raised new safety concerns, instead of investigating these concerns and reopening TRRC II, the Board denied the motion to reopen and suggested that if the TRRC desired to propose an alternative, it could do so by submitting a new application—TRRC III. In denying the motion to reopen, the Board rejected TRRC's "new" evidence

because it was not new. The Board stated that "[e]ither the concerns [the TRRC] addresses have already been extensively considered and disposed of by SEA or the Board or the evidence, relating to a construction project first proposed 5 years before SEA issued its FEIS, could have and should have been developed and presented earlier." As for the evidence in the "new" studies conducted by the TRRC's contractor, Mission Engineering, and studies conducted by BNSF, the Board stated that "[t]his evidence, although newly introduced, is not new because it also could have been presented earlier, but was not." Thus, the record indicates that the Board may not have evaluated the TRRC and BNSF's new evidence of safety concerns on the merits, but instead rejected the motion to reopen on the grounds that the evidence should have been presented earlier.

However, in evaluating the new TRRC III application, the Board still did not review the new evidence of operational and safety concerns, and instead considered the Four Mile Creek Alternative as "currently authorized," and the "no-build" alternative considered in TRRC III. By the time the Board prepared the DSEIS in October 2004, the Board was well aware of the concerns that the TRRC and BNSF had raised about the viability of the Four Mile Creek Alternative from a safety and operational perspective. Moreover, in 2004, the Board was aware that the TRRC had asked to suspend proceedings due to financial problems in 2000, after which review was suspended for almost three years. The Board also did not revisit the financial viability of the Four Mile Creek Alternative when it considered it the "no-build" alternative in TRRC III in light of the changed financial circumstances. Thus, we conclude that the Board's decision in TRRC III was arbitrary and capricious in light of the evidence it had before it regarding the TRRC and BNSF's safety concerns that arose subsequent to the Board's approval of TRRC II.

[35] To summarize our holdings for Section II, we find that the Board's decision not to review new evidence of oper-

ational and safety concerns for the Four Mile Creek Alternative in TRRC III to be arbitrary and capricious, and we reverse and remand on that ground. We affirm the Board on Petitioners' other railroad claims.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE and REMAND** in part. Each party shall bear its own costs on appeal.

## APPENDIX



FIGURE 1-1

TONGUE RIVER RAILROAD COMPANY'S APPROVED LINE
FROM MILES CITY TO DECKER