NATIONAL PARKS AND CONSERVATION ASSOCIATION, et al., Plaintiffs,

v.

Donald P. HODEL, et al., Defendants.

Civ. A. No. 86–1951.

United States District Court, District of Columbia.

Oct. 30, 1987.

harm to the environment." *Id.* at 310, 102 S.Ct. at 1802.

James M. Day, G. Lindsay Simmons, Washington, D.C., for plaintiffs.

Mark E. Nagle, U.S. Attorney's Office, Washington, D.C., for Federal defendants.

Andrew A. Normandeau, Washington, D.C., for Guest Services.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiffs, The National Parks and Conservation Association ("NPCA") and five individuals who are members of the Committee for the Preservation of Daingerfield Island, bring this action against defendants, Secretary of the Interior ("the Secretary"), certain named officials of the National Park Service ("the Park Service"), and Guest Services, Inc. ("GSI"). The subject of the suit is the defendants' approval of the 1984 construction of the Potowmack Landing Restaurant and facility on Daingerfield Island in the George Washington National Parkway and the imposition of certain charges for boat slip rentals and marina services at the facility.

In essence, plaintiffs claim that the Park Service and the Secretary violated the National Environmental Policy Act of 1969, as amended, ("NEPA"), 42 U.S.C. § 4332(B) and (C) by failing to do an environmental assessment of the project actually implemented; that the Secretary and GSI violated the Concessions Policy Act ("CPA"), 16 U.S.C. §§ 20 et seq., by constructing a facility that was not necessary to serve the park users nor proper for a national park site; and that the Park Service and GSI are charging unreasonable rates for both the

marina facilities and for submetering of electricity to certain wet slip lessees contrary to law and contract. Plaintiffs request that the court enjoin defendants from operating the facility until NEPA and the CPA are complied with and reasonable rates are established.

Presently before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, the Court concludes that plaintiffs have unreasonably delayed in asserting their claims in this case and to allow them to go forward at this late date would substantially prejudice the defendants. Accordingly, without reaching the merits of the NEPA and CPA claims, the Court, in exercise of its equity jurisdiction, finds that plaintiffs' NEPA and CPA claims are barred by laches. As to plaintiffs' claim arising from the marina slip rates, the Court declines to find a private right of action under the CPA, nor does it find plaintiffs to be an intended third party beneficiary to the contract, thus this claim must also be dismissed. As to plaintiffs' claim arising from the submetering electrical charges, in light of the reduction of that rate to its prior unchallenged level, the Court finds that the claim is in part moot. The remaining portion of the claim, which requests a refund for past overcharges must fail because the Virginia law upon which plaintiffs rely is not controlling. Plaintiffs' motion for summary judgment must be denied and defendants' cross motion for summary judgment must be granted.

*Factual Background*

Daingerfield Island, part of the National Park System, is a 107 acre area of river front land situated between the Potomac River and the George Washington Memorial Parkway, just south of National Airport in Alexandria, Virginia. The Washington Sailing Marina is located on the northern part of Daingerfield Island, along with several soccer fields, a parking lot, a portion of the bike path which runs for a number of miles along the banks of the Potomac, picnic grounds, and the multi-use facility known as the Potowmack Landing Restau-rant. The majority of the land on Daingerfield Island remains undeveloped.

The Potowmack Landing Restaurant and the adjoining portions of the building is approximately 15,000 square feet. The main area of the building is comprised primarily of a formal dining room, which seats 415, a small snack bar, a ward room containing a large bar area and in which there is also limited food service, a private party room, and a large outdoor deck with tables. An adjoining portion of the building houses a shop selling souvenirs, boating and cycling supplies.

Prior to 1946, there existed a facility, which was erected in 1918 and was later moved to Daingerfield Island from its original site at 21st Street and Constitution Avenue, that housed the Wakefield Tea House and later a snack bar, until the construction of the present facility. In 1946, the National Capital Region of the Park Service contracted with GSI to operate the food service concession on Daingerfield Island.

For at least fifteen years, the northern twenty five acres of Daingerfield Island contained a sailing marina, a food concession, parking lots, a picnic area and playing fields. The remainder of the area has remained in its natural state except for a tree farm and research center and several small storage areas. In 1964, GSI took over operation of the marina facilities as well.

The Park Service entered into a new concession contract with GSI in 1972, which expires in December 1991. Under this contract, GSI is authorized to provide facilities and services to the public within park areas administered by the National Capital Region. In return, GSI has agreed to pay the Park Service a fixed annual fee for the use of government owned structures, plus a percentage of its gross receipts from operations. In addition, GSI agreed to undertake a building and improvement program of not less than one million dollars. GSI was granted the right to provide the specified services and to provide new or additional facilities and services as necessary and desirable for the accommodation and convenience of the public. Due to the age

and deterioration of the old Wakefield Tea House building, the Park Service began planning for the improvement of the facilities on Daingerfield Island in 1975.

As described in the administrative record, the planning process begins when Congress establishes the park's purpose. The Park Superintendent and staff set up goals and objectives consistent with congressional mandates, National Park Service Management Policy, and public needs. These objectives are defined and formalized by the Park Service, reviewed by the regional office, and provide the basis for a Task Directive—a contract between the park, the region, and the Park Service's planning, design, and construction center— to provide professional planning services.

The first phase of the planning process for Daingerfield Island began with an exhaustive study of the Island and its users, called the "Basic Data for the Development Concept Plan and the Assessment of Alternatives." ("Basic Data"). Admin.Record at Tab 13. It is a detailed report on the physical, cultural, biological, and environmental systems of the Island.

Upon completion of the Basic Data, the Park Service conducted several public workshops to discuss the formulation of plans for the future use of the Island. *See* "Summary of Public Workshops for Daingerfield Island Held on December 6 and 8, 1977" Admin.Record at Tab 14. The purpose of the workshop meetings was to identify planning issues with the involvement of members of the public. On the basis of information adduced in the Basic Data and at the workshops, the Park Service prepared an Environmental Assessment and Development Concept Plan for Daingerfield Island ("EA"). The EA was completed in May 1980. Five alternatives, each addressed to the entire Daingerfield Island area, were included in the EA. Each made various degrees of change with respect to marina facilities, storage, parking, concession buildings, and other parts of the Island. *See* Admin.Rec. at Tab 20.

On June 20, 1980, notice of the EA was published in the *Federal Register* along with notice of a public hearing on the issue.

Public comment was invited for the next sixty days. Copies of the EA was posted in various locations including the Main Branch of the Alexandria City Library and at the Washington Sailing Marina. A public hearing was held on July 23, 1980, at which the five alternatives were discussed at length. (Transcript of Hearing at Admin.Rec. Tab 23.)

On July 12, 1982, the Superintendent of the George Washington Memorial Parkway, Manus Fish, sent his Record of Decision ("ROD") to the Regional Director of the National Capital Region. In that document, Fish found that no single alternative of those presented in the EA totally satisfied the combined needs of the Park Service and the public. Fish decided to combine elements of all of the alternatives in order to formulate a new proposed plan. Fish indicated that the new proposal did not constitute major federal action which significantly affects the quality of the human environment as described in Section 102(2)(C) of NEPA, therefore, no Environmental Impact Statement was needed. The ROD was published in the *Federal Register* on September 20, 1982, and copies were sent to those who testified at the public hearing. Comments on the ROD were invited; however, the defendants assert that none were received and there is no evidence to the contrary.

The Task Directive was prepared in draft form on December 10, 1982, and revised on December 28, 1982. It stated as an objective "[t]he continuation of providing visitor services on the Island to serve both the general and boating public through replacement of the existing concessions building at the northern tip of the Island. *Thus expanding the existing services for a greater range of visitors and an expanded period of use.* [sic]" Admin.Record at Tab 34. (emphasis added)

After further study by GSI, throughout 1983 and the first part of 1984, GSI prepared detailed building plans for the new facility. Mr. Vincent Rogers, a partner of Giuliani Associates, the architects of the new facility, states in his affidavit that a meeting was held at Giuliani Associates

offices at which certain of the plaintiffs, including Marcia Green, were shown architectural "blueline copies of presentation drawings" of the facility. Rogers Aff. at 2. According to Rogers those drawings represented the facility in all important aspects exactly as it was subsequently built.

The final architectural plans for Daingerfield Island were reviewed and approved by the Park Service in March 1984. Throughout 1984, the record reflects that there was correspondence among the sailing groups, GSI, and the local and Federal officials involved in implementing the final plans for the Island. In January and February 1984, GSI received written comments from at least three of the Commodores of the sailing groups with regard to the plans. Construction of the new facility began in early 1984. GSI provided a status report to the sailing clubs advising them of progress at the facility, including color "stats" of the elevation renderings, the floor plans, schematics of the new structure and arrangements within each area. Admin.Rec. at Tab 111. Communications among GSI, the sailing community, and the Park Service continued throughout the construction process. Plaintiff Marcia Green states in her affidavit that "[a]s construction continued, I became alarmed that the building looked much larger than I had expected. It wasn't until I saw the interior finishes, however, that I truly began to realize that this certainly did not look like the facility I had expected because of my earlier contacts with GSI. I had anticipated a much smaller and more casual facility." Green Aff. at 2.

In December 1984 the new facility was opened on a limited basis. It is in excess of 15,000 square feet and seats over 550 people, including the outside deck area and the inside bar area. The cost of construction was almost three million dollars. Two "formal" opening parties were held on January 29 and 30, 1985, of which several of the club Commodores attended.

The Committee to Preserve Daingerfield Island was formed in January 1985. Members of that committee were in communication with both GSI and the Park Service during 1985 to express their concern over various aspects of the new facility with which they were displeased. The record indicates numerous instances in which committee members expressed their concerns to the defendants and defendants responded to the committee members, often indicating that corrective action would be or had been taken. One of the major complaints of the committee related to the size and formality of the new facility. This ongoing process of communications between all parties continued up to the time this suit was filed on July 14, 1986.

*Analysis*

 There are three criteria which must be met before the doctrine of laches may be applied. Defendants must show "(1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim was asserted." *Save our Wetlands, Inc. v. U.S. Army Corps of Engineers,* 549 F.2d 1021, 1026 (5th Cir.1977). Assuming those criteria are met, the doctrine of laches applies to NEPA cases as it does to other types of litigation. *Peshlakai v. Duncan,* 476 F.Supp. 1247, 1256 (D.D.C.1979); *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860, 867 (5th Cir.1975).

 In this case the record is replete with evidence of plaintiffs' knowledge of the proposed facility at least as early as 1983. Plaintiffs concede that they knew on January 19, 1983, that defendants contemplated an expanded facility. *See* Plaintiffs' Memorandum is Support of Motion at 11. Moreover, Green herself states in her affidavit that once construction began she realized the facility was larger than expected. Thus, plaintiffs arguments that they did not know of the increased size until a later date are not credible. In spite of this indisputable knowledge of the possible basis for a claim by plaintiffs, plaintiffs waited until July 16, 1986, to file this action. Plaintiffs, therefore, delayed at least three years in bringing this action.

Plaintiffs argue that if there was a delay it was excusable because they were not

made aware of the overcrowding problems at the Island until the facility was fully operational. Once they were aware of the parking problems caused by the overcrowding, plaintiffs claim they exercised diligence and attempted to work with GSI and the Park Service to remedy it. This argument, however, is disingenuous. Plaintiffs' NEPA claim is premised on the defendants' failure to take the requisite "hard look" at the proposed action, *see Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Committee*, 449 F.2d 1109 (D.C.Cir.1971), and to do an adequate Environmental Assessment and, if called for, Environmental Impact Statement. Assuming, *arguendo*, that defendants adopted a proposal that was not given adequate consideration as required by NEPA, plaintiffs would have had knowledge of this when they knew of the adoption of that particular proposal as opposed to one of those set out in the EA or described in the ROD. A cause of action under NEPA would then have accrued and plaintiff could have brought suit at that time. It was not necessary for plaintiffs to wait to see if a parking problem would eventually develop before bringing suit.

Even if the overcrowding and parking problems resulted from the decision to build an expanded facility, those harms were certainly foreseeable. Plaintiffs could have challenged the decision to build the expanded facility as soon as they were aware of the decision selected. They did not have to wait for the potential harm, if any, to actually occur. Moreover, they do not base their legal claims merely on the lack of adequate parking.

Granting the relief sought by plaintiffs in this case would clearly prejudice defendants. Capital expenditures of almost three million dollars have been made for the Daingerfield Island facility. A number of actions have been taken by defendants which plaintiffs might have been successful at preventing before the fact had plaintiffs brought this suit in a timely manner. While it is recognized that courts do not favor the application of laches in environmental suits, *see, e.g., Arlington Coalition of Transportation v. Volpe*, 458 F.2d 1323,

1329 (4th Cir.), *cert. denied* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1973), granting the relief now requested would severely impact upon GSI as well as the Park Service management of Daingerfield Island. Plaintiffs have unreasonably delayed in bring their claims under NEPA and the CPA to the prejudice of the defendants. The Court, therefore, need not reach the merits of those claims.

▪ Plaintiffs contend in Count III of their complaint that GSI and the Park Service violated the CPA by approving fees for marina slip rentals and services that are unreasonable. No authority has been cited by plaintiffs to sustain their position that a private right of action exists under the CPA. Following the Ninth Circuit, this Court declines to recognize a private cause of action under that Act. *Glacier Park Foundation v. Watt*, 663 F.2d 882 (9th Cir.1982) (declining to find private right of action under CPA).

▪ Plaintiffs also assert that they have standing to challenge the marina rates as third party beneficiaries to the contract between GSI and the Park Service based on a breach of contract claim. The language of that contract makes clear that the intended beneficiary is the public at large, not any specific or identifiable segment of the public such as plaintiffs. Plaintiffs may not, therefore, challenge the contract unless a specifically intended third party beneficiary. *Berberich v. U.S.*, 5 Cl.Ct. 652, 655 (1984) *aff'd mem.*, 770 F.2d 179 (Fed.Cir.1985).

▪ Finally, plaintiffs challenge the electric submetering charges imposed by defendants. That charge has since been reduced from the challenged $3.00 rate to $1.00; thus, defendants assert that the claim is now moot as it relates to any continuing violation of law. Plaintiffs additionally seek a rebate for the overcharged dollars prior to the reduction to $1.00. Review of the plain language of the controlling Virginia statute upon which plaintiffs premise their claim, however, reveals that it does not apply to submetering of electricity at marinas. Accordingly, plaintiffs fi-

nal claim must fail. An accompanying Order will be issued in accordance with this Opinion.

### ORDER

Upon consideration of the cross-motions for summary judgment, supporting and opposing memoranda, the entire record, and for the reasons stated in the accompanying Memorandum Opinion, it is this 29th day of October, 1987,

ORDERED that the motion of defendants be, and hereby is, granted; it is further

ORDERED that the motion of plaintiffs be, and hereby is, denied; and it is further

ORDERED that the complaint herein be, and hereby is, dismissed.