**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE SAVE THE PEAKS COALITION;
KRISTIN HUISINGA; CLAYSON
BENALLY; SYLVAN GREY; DON
FANNING; JENEDA BENALLY;
FREDERICA HALL; BERTA BENALLY;
RACHEL TSO; LISA TSO,
       *Plaintiffs-Appellants,*

    v.

UNITED STATES FOREST SERVICE;
JOSEPH P. STRINGER, Acting Forest
Supervisor for the Coconino
National Forest,
       *Defendants-Appellees,*

ARIZONA SNOWBOWL RESORT LP,
    *Intervenor-Defendant-Appellee.*

No. 10-17896

D.C. No.
3:09-cv-08163-
MHM

OPINION

Appeal from the United States District Court
for the District of Arizona
Mary H. Murguia, District Judge, Presiding

Argued and Submitted
January 9, 2012—San Francisco, California

Filed February 9, 2012

Before: J. Clifford Wallace, John T. Noonan, Jr., and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

1449

## COUNSEL

Howard M. Shanker (argued), The Shanker Law Firm, PLC, Tempe, Arizona, for the plaintiffs-appellants.

Ignacia S. Moreno, John Tustin, Cynthia Huber, Lane N. McFadden (argued), United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Catherine E. Stetson (argued), Hogan Lovells US LLP, Washington, D.C., for the intervenor-defendant-appellee.

**OPINION**

M. SMITH, Circuit Judge:

This case represents a gross abuse of the judicial process. Just when Defendants-Appellees United States Forest Service and Joseph P. Stringer (USFS), and Intervenor-Defendant Arizona Snowbowl Resort Limited Partnership (ASRLP) had successfully defended an agency decision to allow snowmaking at a ski resort on federal land all the way to the United States Supreme Court, "new" plaintiffs appeared. Represented by the same attorney as the losing parties in the first lawsuit, the "new" plaintiffs—who had closely monitored and, in some cases, actively encouraged and helped finance the first litigation—brought certain environmental claims that were virtually identical to some that the attorney had improperly attempted to raise in the earlier lawsuit, for no apparent reason other than to ensure further delay and forestall development. Years had passed since the original proposal had been made. According to the record, ASRLP, which operated the ski resort, faced a looming prospect of financial ruin without the ability to proceed with the plan to produce snow. Neither fact deterred the "new" plaintiffs' lawsuit. Nor did the meritless nature of their claims under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

Although it is apparent to us that the "new" plaintiffs and their counsel have grossly abused the judicial process by strategically holding back claims that could have, and should have, been asserted in the first lawsuit (and would have been decided earlier but for counsel's procedural errors in raising those claims), we are compelled to hold that laches does not apply here because the USFS and ASRLP cannot demonstrate that they suffered prejudice, as defined by our case law. *See Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 n.8 (9th Cir. 1998). Nevertheless,

we hold that the Save the Peaks Plaintiffs' claims fail under NEPA and the APA. Accordingly, we hold that the district court properly granted summary judgment to the USFS and ASRLP, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The Arizona Snowbowl (Snowbowl) is a ski area on the western flank of the San Francisco Peaks operated by ASRLP. It is operated under a special use permit issued by the USFS, and supports approximately 200 full-time jobs and $12.08 million in economic output.

To generate revenues, Snowbowl depends on visits from skiers. Unlike most ski areas in the United States, Snowbowl relies entirely on natural snowfall and does not operate snow-making equipment. Because natural snowfall at Snowbowl is highly variable (ranging from 68% below median snowfall to 95% above median snowfall over 22 seasons), Snowbowl is often plagued by poor skiing conditions and limited availability for skiing. Visits by skiers and profitability have closely paralleled the availability of snow. For example, Snowbowl had over 193,564 visitors during the 2004-2005 ski season when it snowed more than 460 inches, but fewer than 3,000 visitors during the 2001-2002 ski season when it snowed only 50 inches. Without greater consistency in the availability of snow to draw visitors, the record suggests that Snowbowl will go out of business.

In 2000, ASRLP began conducting preliminary work on a proposal to make its own artificial snow. ASRLP proposed to build a facility to regularly produce snow sufficient to cover 203.5 acres of land. The water to be used for producing the snow would be Class A+ reclaimed water provided by the City of Flagstaff and treated at the Rio de Flag Water Reclamation Facility (Rio de Flag).

In February 2004, the USFS released a Draft Environmental Impact Statement (DEIS) for the project. Over 5,700 peo-

ple submitted comments during the 60-day DEIS comment period, including Plaintiffs-Appellants The Save the Peaks Coalition, Kristin Huisinga, Clayson Benally, Sylvan Grey, Don Fanning, Jeneda Benally, Frederica Hall, Berta Benally, Rachel Tso, and Lisa Tso (collectively, the Save the Peaks Plaintiffs) regarding, among other things, the health effects of ingesting reclaimed water. After receiving the comments, the USFS prepared a Final Environmental Impact Statement (FEIS), which included updates to the original analysis in the DEIS based on substantive comments received, and 31 pages of analysis concerning the quality of the water to be used in making artificial snow at Snowbowl and the health effects of ingesting snow made from that water.

In June 2005, four groups of plaintiffs, including individuals, several Native American Tribes and Nations, and environmental organizations (collectively, the Navajo Nation Plaintiffs), filed suit in the United States District Court for the District of Arizona to stop the USFS from permitting ASRLP to produce artificial snow using Class A+ reclaimed water at Snowbowl. The complaint alleged, inter alia, that the USFS had failed to comply with NEPA, the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*; and certain other federal statutes.

The district court granted summary judgment to the defendants on all claims (including the NEPA claims) other than the Navajo Nation Plaintiffs' claim under RFRA.[1] After a bench trial, the district court also rejected the RFRA claim. On appeal, a three judge panel of our court affirmed in part

---

[1]Although the Navajo Nation Plaintiffs claimed at summary judgment that the USFS did not consider the risks posed by human ingestion of snow made from reclaimed water in the FEIS (i.e., the same claim raised in this appeal), we, sitting en banc, found that the Navajo Nation Plaintiffs had not appealed the district court's denial of their motion to amend the complaint to add such an allegation, and that they had thus waived the claim on appeal. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1079-80 (9th Cir. 2008) (en banc).

and reversed in part. *See Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1060-61 (9th Cir. 2007), *rev'd en banc*, 535 F.3d 1058 (9th Cir. 2008). Specifically, our three judge panel held that the USFS's approval of the proposed expansion of Snowbowl, including the use of reclaimed water to make snow, violated the RFRA. *See id.* at 1060. It also held that the USFS violated NEPA because its FEIS did not reasonably discuss the risks posed by the possibility of human ingestion of snow made from reclaimed water or articulate why such a discussion was unnecessary.[2] *See id.* The district court's grant of summary judgment on the remaining claims was affirmed. *See id.* at 1060-61. We accepted the case en banc, thereby vacating the opinion of our three-judge panel, *Navajo Nation*, 506 F.3d at 718, and, sitting en banc, we upheld the entirety of the district court's decision, *see Navajo Nation*, 535 F.3d at 1080. The Navajo Nation Plaintiffs sought review of our en banc decision by the United States Supreme Court, which denied their petition for a writ of certiorari on June 8, 2009. *See Navajo Nation v. U.S. Forest Serv.,* 129 S. Ct. 2763, 2763 (2009).

When the Supreme Court denied certiorari, the USFS and the ASRLP had good reason to believe that the issues involved in the case had been fully and fairly litigated, and that their legal nightmare had ended. Little did they know what awaited them.

While the *Navajo Nation* litigation was pending, the Save the Peaks Plaintiffs closely monitored the case's progress, but declined to join it as parties. Some of the Save the Peaks Plaintiffs are either members of, or associated with, the same organizations that participated in the *Navajo Nation* litigation.

---

[2]A majority of the nonrecused active judges of our court voted to rehear the case en banc, and ordered that our "three-judge panel opinion shall not be cited as precedent by or to this court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court." *Navajo Nation v. U.S. Forest Serv.*, 506 F.3d 717, 718 (9th Cir. 2007).

Moreover, some of the Save the Peaks Plaintiffs solicited money to pay for the *Navajo Nation* litigation, and some organized and attended protests and events in support of the *Navajo Nation* plaintiffs. The attorney who represented the Navajo Nation Plaintiffs before the district court and our court also represents the Save the Peaks Plaintiffs in this case. A statement on the Save the Peaks Plaintiffs website even calls *Navajo Nation* "our prior court case."

In the words of one of the Save the Peaks Plaintiffs, "once [the Navajo Nation Plaintiffs'] case was thrown out, we knew that it was time for us to step up to see if there was something we could do." Shortly after the Supreme Court denied certiorari in *Navajo Nation*, the Save the Peaks Plaintiffs commenced the litigation now before us by filing a complaint on September 21, 2009. They alleged that the USFS violated NEPA because the FEIS does not contain a reasonably thorough discussion of the significant aspects of the probable environmental consequences of Snowbowl making snow from reclaimed water, the USFS failed to ensure the scientific integrity of its analysis, and the USFS did not disseminate quality information.

The district court granted the defendants' motions for summary judgment. It found that laches barred the Save the Peaks Plaintiffs' claims and, alternatively, that even if laches did not apply, the USFS had not violated NEPA or the APA. The Save the Peaks Plaintiffs timely appealed.

## STANDARD OF REVIEW AND JURISDICTION

We review de novo whether laches is a valid defense to a particular action and review a district court's decision whether to apply laches to the facts for abuse of discretion. *See Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 991 (9th Cir. 2009) (citations omitted); *O'Donnell v. Vencor, Inc.*, 465 F.3d 1063, 1066 (9th Cir. 2006) (per curiam) (citation omitted).

We review de novo the district court's grant of summary judgment. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005) (citation omitted); *see also Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010) (citation omitted).

We have jurisdiction pursuant to 28 U.S.C. § 1291. *See* 28 U.S.C. § 1291; *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011).

## DISCUSSION

The Save the Peaks Plaintiffs argue that the district court erred in finding that laches barred their claims. They also contend that the district court erred in finding that the USFS complied with NEPA and the APA.

### A.   Laches

**[1]** Laches is an equitable defense that limits the time in which a party may bring suit. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002). It derives from the maxim that a party who sleeps on his rights loses his rights. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). Whether laches applies depends on the particular facts and circumstances of each case. *See Ocean Advocates*, 402 F.3d at 862.

**[2]** To establish laches, a party must demonstrate "(1) that the opposing party lacked diligence in pursuing its claim; and (2) that prejudice resulted from that lack of diligence." *Neighbors of Cuddy Mountain*, 137 F.3d at 1381 (citation omitted); *see Ocean Advocates*, 402 F.3d at 862. Because environmental damage does not inflict harm only on the plaintiff, laches is strongly disfavored in environmental cases. *See Ocean Advocates*, 402 F.3d at 862. "The use of laches 'should be restricted to avoid defeat of Congress' environmental policy.'" *Id.* (quoting *Coal. for Canyon Pres. v. Bowers*, 632 F.2d

774, 779 (9th Cir. 1980)); *see also Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir. 1982).

## 1. Diligence

To determine whether a party lacked diligence in pursuing its claim, we consider "(1) whether the party attempted to communicate its position to the agency before filing suit, (2) the nature of the agency response, and (3) the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging an agency action." *Pres. Coal.*, 667 F.2d at 854; *see Ocean Advocates*, 402 F.3d at 862. Those factors cannot always be neatly applied to the facts of a particular case. *See Pres. Coal.*, 667 F.2d at 854. Other relevant considerations include "the length of the delay" before the plaintiff filed suit and "the circumstances surrounding that delay." *In re Beaty*, 306 F.3d 914, 927 (9th Cir. 2002).

**[3]** Here, the application of the relevant factors confirms that the Save the Peaks Plaintiffs lacked diligence in pursuing their claims. Although some of them made comments about the DEIS and participated in the administrative appeal process, all of the Save the Peaks Plaintiffs (excluding their counsel) ceased communications with the USFS after 2005, until they filed this lawsuit. Moreover, throughout that same period, the Save the Peaks Plaintiffs were aware of, and actively supported, the *Navajo Nation* litigation, but declined to join the lawsuit. The failure of the *Navajo Nation* litigation appears to be the entire reason why the Save the Peaks Plaintiffs, after years of silence, decided to bring an action. Under these circumstances, the Save the Peaks Plaintiffs pursued an approach more consistent with sleeping on their rights than vigorously enforcing them. The lack of any consistency in the Save the Peaks Plaintiffs asserting their position—other than at the strategically convenient time after the first challenge to the snowmaking proposal failed—is strong evidence that they

lacked diligence. *See Apache Survival Coal. v. United States (Apache Survival Coal. I)*, 21 F.3d 895, 909 (9th Cir. 1994).

**[4]** The USFS clearly considered and responded in approximately 31 pages of analysis in the FEIS to concerns about the risk and safety of human ingestion of snow made from reclaimed water. The USFS's response to comments about the DEIS also addressed the same concerns raised by the Save the Peaks Plaintiffs, as did its record of decision. The USFS took the concerns seriously, evaluated them rigorously, and concluded that they should not preclude snowmaking at Snowbowl. By 2005, the Save the Peaks Plaintiffs were fully on notice of the USFS's conclusions about human ingestion of snow made from recycled water, but did nothing for four years. Under these circumstances, the nature of the agency's response also confirms that the Save the Peaks Plaintiffs lacked diligence.

Importantly, the snowmaking proposal at Snowbowl did not change after the USFS approved it in 2005. The Save the Peaks Plaintiffs were aware of the USFS's decision and the pending litigation in *Navajo Nation* from 2005 to 2009. Nevertheless, the Save the Peaks Plaintiffs declined to join the *Navajo Nation* litigation, preferring instead to wait until the *Navajo Nation* Plaintiffs lost before filing claims. The Save the Peaks Plaintiffs had every reason to vindicate what they thought were their rights, but they did nothing. Thus, the Save the Peaks Plaintiffs also fail the third prong of diligence.

**[5]** The four-year delay by the Save the Peaks Plaintiffs in bringing an action after the USFS's issuance of the FEIS fully supports finding a lack of diligence, particularly considering the circumstances surrounding the delay. Other courts have found comparable delays inexcusable. *See, e.g.*, *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1338 (10th Cir. 1982); *Nat'l Parks & Conservation Ass'n v. Hodel*, 679 F. Supp. 49, 53-54 (D.D.C. 1987).

**[6]** The circumstances surrounding the four-year delay are egregious. The Save the Peaks Plaintiffs not only waited to bring an action until the Navajo Nation Plaintiffs' claims failed, but seem to have been solely motivated by the outcome in *Navajo Nation*. The "new" parties in this litigation appear to be little more than a vehicle for the Navajo Nation Plaintiffs' counsel to evade res judicata and collateral estoppel. We do not "encourage successive challenges, where one plaintiff awaits the outcome of another plaintiff 's [case] before bringing its own claim." *Apache Survival Coal. v. United States (Apache Survival Coal. II)*, 118 F.3d 663, 666 n.5 (9th Cir. 1997). Nor do we encourage strategic gamesmanship in litigation to hinder development and impose costs unnecessarily. *See FTC v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004); *Natural Res. Defense Council, Inc. v. Thomas*, 838 F.2d 1224, 1252 (D.C. Cir. 1988). Accordingly, the district court properly concluded that the Save the Peaks Plaintiffs lacked diligence in pursuing their claims.

## 2. Prejudice

**[7]** "Prejudice in environmental actions is measured by 'what Congress defines as prejudice. The primary concern is whether the harm that Congress sought to prevent . . . is now irreversible.' " *Neighbors of Cuddy Mountain*, 137 F.3d at 1382 (quoting *Apache Survival Coal. I*, 21 F.3d at 912) (alterations in original). Accordingly, two relevant factors are "the money spent on a project and the extent to which a project has progressed so far that 'the harm [plaintiffs] fear' has already occurred." *Id.* (quoting *Apache Survival Coal. I*, 21 F.3d at 912-13) (alterations in original). In our circuit, we have also concluded that a private company's economic loss caused by delay in completing a project is irrelevant to the prejudice inquiry. *See Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 555*; Grand Canyon Trust v. Tucson Electric Power Co.*, 391 F.3d 979, 988 (9th Cir. 2004); *Neighbors of Cuddy Mountain*, 137 F.3d at 1381 n.8. A lengthy, unexcused delay that does not result in prejudice is not a sufficient basis for laches to

apply. *See Grand Canyon Trust*, 391 F.3d at 988. "Difficulties caused by the pendency of a lawsuit, and not by delay in bringing the suit do not constitute prejudice within the meaning of the laches doctrine." *Shouse v. Pierce Cnty.*, 559 F.2d 1142, 1147 (9th Cir. 1977) (per curiam).

In finding prejudice, the district court focused on "the fact that the Snowbowl improvement project is almost complete" and "near completion."[3] The district court considered that fact, "coupled with the burden of serial and similar litigation," sufficient to find prejudice.

In reaching this conclusion, the district court relied on erroneous findings of fact. The snowmaking project at Snowbowl is not near completion and construction had not even begun when this lawsuit was commenced. Although the USFS and ASRLP stated at oral argument that construction began after the lawsuit was filed and that some of the water pipeline has been installed, prejudice must be judged as of the time the lawsuit was filed, thereby eliminating consideration of post-lawsuit expenditures and progress in constructing the pipeline. *See Cornetta v. United States*, 851 F.2d 1372, 1386 (Fed. Cir. 1988) (Michel, J., concurring) ("[T]he period after the filing of the suit cannot be relevant to the prejudice inquiry since the laches determination only focuses on the time and events taking place until suit is filed."); *see also Shouse*, 559 F.2d at 1147.

**[8]** Because construction had not begun when the Save the Peaks Plaintiffs filed suit, harm to the environment was not irreversible, and the harm that the Save the Peaks Plaintiffs

---

[3]We disagree with ASRLP's contention that the district court was not referring to the degree of physical construction of the snowmaking project, but to the process of obtaining permission from the USFS and beginning to produce snow at Snowbowl. Such an interpretation is strained. The more natural reading of "near completion" is that the district court was referring to how far physical construction of the snowmaking project had progressed.

feared from human ingestion of snow made from reclaimed water had not already occurred. As in *Neighbors of Cuddy Mountain*, this is not a case where a major project has already been built, or where delays in a project would cause a breakdown of an international coalition or loss of a project to a foreign site. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1382. Accordingly, the primary concern for the prejudice inquiry in environmental cases where laches is at issue suggests that the USFS and ASRLP cannot demonstrate prejudice. *See id.* (explaining that the USFS could not demonstrate prejudice where two nonprofit groups sought only to halt further logging because the harm that the groups feared had not become irreversible); *cf. Apache Survival Coal. I*, 21 F.3d at 912-14 (finding laches in an environmental case where construction of telescopes was 35% complete when the plaintiffs filed their complaint).

ASRLP also argues that the prejudice requirement is met because its economic losses from continuing to operate Snowbowl without the ability to make snow, and its investment of significant resources in the process of seeking approval for the snowmaking project, are sufficient to show prejudice. Our precedents require us to hold to the contrary. *See Klamath Siskiyou Wildlands Ctr.*, 468 F.3d at 555; *Neighbors of Cuddy Mountain*, 137 F.3d at 1381 n.8. Moreover, the fact that ASRLP would lose money if the Save the Peaks Plaintiffs' lawsuit were to proceed is insufficient to demonstrate prejudice. *See Grand Canyon Trust*, 391 F.3d at 988*; see also Neighbors of Cuddy Mountain*, 137 F.3d at 1381 n.8. The increased costs it faces because of the Save the Peaks Plaintiffs' delay in filing suit is also insufficient. *See Pres. Coal.*, 667 F.2d at 855.

The final evidence offered to show prejudice also appears to be unavailing in light of our precedent. According to the USFS, the burden of having to defend against serial litigation of similar claims is sufficient to find prejudice. In support, the USFS relies on an inapposite case where the court considered

that factor, but in the context of facts suggesting that construction was already significantly underway when the lawsuit was filed. *See Apache Survival Coal. II*, 118 F.3d at 664-66; *see also Apache Survival Coal. I*, 21 F.3d at 912. We agree that the Save the Peaks Plaintiffs' lawsuit imposes a burden of having to defend against claims that should have been made in the *Navajo Nation* litigation. We also agree that this burden is unfair. Because the primary consideration weighs against finding prejudice, however, we cannot hold that this burden is sufficient by itself to demonstrate prejudice in this environmental case. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1381-82. Moreover, it appears dubious that the burden of defending against litigation can ever be sufficient, standing alone, to constitute prejudice even if this were not an environmental case. *See Shouse*, 559 F.2d at 1147; *see also Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 808 (8th Cir. 1979); *Vineberg v. Bissonnette*, 529 F. Supp. 2d 300, 311 (D.R.I. 2007), *aff'd*, 548 F.3d 50 (1st Cir. 2008); *Jeffers v. Clinton*, 730 F. Supp. 196, 202-03 (E.D. Ark. 1989) (three-judge district court).

Nevertheless, the facts of this case are unusual because they involve a second lawsuit allegedly attempting to vindicate the public interest. This lawsuit imposes a significant burden on the defendants of having to defend against claims substantially similar to those presented in the *Navajo Nation* litigation. The claims are all ones that could have and should have been decided in that litigation, and would have been decided had counsel not erred in raising them. We strongly believe that this lawsuit represents a serious abuse of the judicial process. The Navajo Nation Plaintiffs, in effect, got a second bite at the apple through their surrogates, the Save the Peaks Plaintiffs.[4] We have been unable to find another case substantially

---

[4] Although the Save the Peaks Plaintiffs are surrogates, they are not sufficiently related to the Navajo Nation Plaintiffs for an exception to the rule against nonparty preclusion to apply. *See Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008).

like this one where a prejudice finding for laches has been considered. Unlike other cases involving laches in environmental cases, the public interest in ensuring that the USFS complied with federal law in authorizing snowmaking at Snowbowl was vigorously represented in the *Navajo Nation* litigation. *See, e.g.*, *Ocean Advocates*, 402 F.3d at 862. Indeed, the case was litigated all the way to the Supreme Court. *See Navajo Nation*, 129 S. Ct. at 2763.

**[9]** Notwithstanding the above, while we might otherwise be inclined to further consider whether prejudice can be shown under the unique facts of this case, we decline to do so because the district court decided the ultimate question in the alternative, making it unnecessary for us to further consider the prejudice issue here. Accordingly, we hold that neither the USFS nor ASRLP can show prejudice, and that the district court abused its discretion in finding that the Save the Peaks Plaintiffs' claims are barred by laches.

## B.   Merits of Save the Peaks Plaintiffs Claims

The Save the Peaks Plaintiffs contend that the district court erred in its alternative ruling on the merits. According to the Save the Peaks Plaintiffs, the USFS did not adequately consider the possibility of human ingestion of snow in the FEIS, did not ensure the scientific integrity of its NEPA analysis, and did not provide "high quality" environmental information to the public about the safety of exposure to reclaimed water, violating NEPA and the APA.

### 1.   Whether the USFS Adequately Considered the Possibility of Human Ingestion of Snow in the FEIS

Under NEPA, federal agencies must take a "hard look" at the potential environmental consequences of proposed actions. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, ___ F.3d ___, Nos. 97-70037, 97-70099, 97-70217, 07-74348, 2011 WL 6826409, at *4 (9th Cir. Dec. 29, 2011)

(citation omitted); *Lands Council v. McNair*, 629 F.3d 1070, 1075 (9th Cir. 2010) (citation omitted). The purpose of NEPA is to "ensure that agencies carefully consider information about significant environmental impacts" and "guarantee that relevant information is available to the public." *Lands Council*, 629 F.3d at 1075; *accord N. Plains Res. Council*, 2011 WL 6826409, at *14.

NEPA requires federal agencies to prepare an environmental impact statement "for all 'major Federal actions significantly affecting the quality of the human environment.' " *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1056 (9th Cir. 2011) (citation omitted); *accord N. Plains Res. Council*, 2011 WL 6826409, at *1. We employ a rule of reason standard to evaluate whether an environmental impact statement "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (citation omitted); *accord Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000). "[A]s long as the agency has 'considered the relevant factors and articulated a rational connection between the facts found and the choice made,' " we must uphold the agency's decision. *League of Wilderness Defenders Blue Mountains Biodiversity Project*, 615 F.3d at 1130 (citation omitted).

Challenges to an agency's compliance with NEPA are reviewed under the standards set forth in the APA. *Se. Alaska Conservation Council*, 649 F.3d at 1056 (citations omitted); *see N. Plains Res. Council*, 2011 WL 6826409, at *3; *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citations omitted). "Under the APA, the agency's decision may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Se. Alaska Conservation Council*, 649 F.3d at 1056 (citation omitted); *accord N. Plains Res. Council*, 2011 WL 6826409, at *3. Review under the arbitrary and capricious

standard is narrow, and we do not substitute our judgment for the agency's judgment. *N. Plains Res. Council*, 2011 WL 6826409, at *3; *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) (citation omitted).

When evaluating a NEPA challenge, our review is limited to whether an environmental impact statement "took a 'hard look' at the environmental impacts of a proposed action." *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010) (citation omitted). This requires "a 'pragmatic judgment whether the [environmental impact statement]'s form, content and preparation foster both informed decision-making and informed public participation.' " *Id.* (citation omitted). The environmental impact statement is reviewed as a whole. *See Nat'l Parks & Conservation Ass'n*, 222 F.3d at 682. Once we are satisfied that an agency has taken a "hard look" at a decision's environmental consequences, our review ends. *See Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1135 (9th Cir. 2006) (citation omitted).

According to the Save the Peaks Plaintiffs, the FEIS contains "no real discussion or analysis of potential impacts of human ingestion." They also alleged that the USFS discussed the potential impacts only in five paragraphs in its response to comments and never discussed them in the FEIS. In support, the Save the Peaks Plaintiffs rely heavily on the panel opinion in *Navajo Nation* that was ordered not to be cited as precedent when the Ninth Circuit accepted the case for rehearing en banc. *See Navajo Nation*, 506 F.3d at 718.

As an initial matter, the Save the Peaks Plaintiffs' reliance on our three-judge panel's vacated opinion is misplaced. The en banc court did not reach the merits of the issue of whether the FEIS failed adequately to consider the risks posed by human ingestion of snow made from reclaimed water. *See Navajo Nation*, 535 F.3d at 1079-80. Because the en banc court did not adopt the three-judge panel's conclusion on this

issue, the panel's conclusion has no precedential value. *See Navajo Nation*, 506 F.3d at 718; *see also Tampubolon v. Holder*, 610 F.3d 1056, 1059 n.4 (9th Cir. 2010); *Marley v. United States*, 567 F.3d 1030, 1037 (9th Cir. 2009).

Moreover, the Save the Peaks Plaintiffs' assertion that the USFS did not consider the risk of human ingestion of snow in the FEIS is incorrect. The FEIS is replete with examples of the USFS considering the risks posed by ingestion and the safety of using reclaimed water to make snow. Throughout the FEIS, the USFS was well aware that untreated reclaimed water "may present known or potential health risks to humans, if *ingested*." Accordingly, the USFS carefully considered the contaminants in untreated water and the degree to which treatment at Rio de Flag would remove those contaminants to make the snow a safe alternative to natural snow.

**[10]** The USFS evaluated studies finding no adverse health effects from drinking reclaimed water. It considered that reclaimed water had been used for snowmaking at a commercial skiing location, that the process of freeze-thaw cycles destroys bacteria in reclaimed water, and that the State of Arizona allows Class A and A+ reclaimed water for direct reuse in snowmaking. Because Snowbowl would use Class A+ reclaimed water for snowmaking, its use of reclaimed water would be permitted by Arizona law and would be deemed safe by the Arizona Department of Environmental Quality (ADEQ). The USFS also considered that the ADEQ has developed strict and specific treatment requirements for reuse applications having high degrees of public contact like skiing that include secondary treatment, filtration, and disinfection. The USFS analyzed data measuring contaminants in reclaimed water treated at Rio de Flag and found that the water satisfied national drinking water standards for the regulated parameters tested. It noted that treatment processes had become sufficiently advanced that reclaimed water had become "a technically and economically feasible source of potable water," limited only because of the lack of public

acceptance. It also noted that a number of projects have used reclaimed water indirectly for potable purposes, such as in replenishing public drinking water supplies.

Underscoring the USFS's attention to the risks posed by human ingestion of snow, the response to comments specifically addressed the concerns raised by the Save the Peaks Plaintiffs.[5] The USFS noted that two major studies had found no adverse health effects to drinking groundwater commingled with reclaimed water. It specifically mentioned the possibility of ingestion of snow and steps that would be taken to minimize the risks of ingestion, such as placing signs advising the public that reclaimed water was used to make snow and to avoid intentional ingestion of snow. It also discussed its conclusion that "the use of reclaimed water in the proposed snowmaking is not considered to have a major adverse impact to the public during recreational skiing and snowplay" and the basis for its conclusion that ingestion of snow would not cause illness.

[11] Having discussed the issue at length in the FEIS and the response to comments, the USFS clearly took a "hard look" at the environmental impacts of permitting the snowmaking project to proceed. The FEIS contains a thorough discussion of the significant aspects of the probable environmental consequences, including the risks posed by human ingestion of snow. Indeed, it is hard to imagine how the USFS's analysis could have been more exhaustive. The form, content, and preparation of the FEIS fostered both informed decision-making and informed public participation.

---

[5]The Save the Peaks Plaintiffs contend that the USFS's response to comments is irrelevant to a court's analysis of whether the USFS took a "hard look." As the district court concluded, however, courts may consider responses to comments for confirmation that an agency has taken a "hard look" at an issue under NEPA. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014-15 (9th Cir. 2006); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1241 (9th Cir. 2005); *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 477 (9th Cir. 2000).

*See Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1072. We affirm the district court's conclusion that the USFS took the requisite "hard look" at the possibility and the risks of persons ingesting snow made from reclaimed water, at Snowbowl.

### 2.   Whether the USFS Ensured the Scientific Integrity of Its NEPA Analysis

The Save the Peaks Plaintiffs also contend that the USFS failed to ensure the scientific integrity of its analysis because it allegedly based its decision entirely on an assumption that ADEQ's analysis of the reclaimed water's safety was sound. This argument is based on the following sentence in the USFS's response to comments: "Because ADEQ approved the use of reclaimed water, it is assumed different types of incidental contact that could potentially occur from use of class A reclaimed water for snowmaking were fully considered." According to the Save the Peaks Plaintiffs, the "assumption" contained in the sentence does not ensure the scientific integrity of the USFS's analysis because the USFS did not oversee the ADEQ's decision-making process or review the ADEQ's conclusions.

**[12]** The Save the Peaks Plaintiffs are mistaken. The USFS had a duty to ensure the scientific integrity of the FEIS' discussion and analysis. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 472 (9th Cir. 2010); 40 C.F.R. § 1502.24. This duty required the USFS to disclose its methodologies and scientific sources. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1213 (9th Cir. 2004). Contrary to the Save the Peaks Plaintiffs' assertion, however, the USFS did not base its decision on an assumption that the ADEQ's analysis was sound. As discussed above, it carefully considered the risks posed by human ingestion of snow throughout the FEIS, most of which made no reference to the ADEQ analysis. Nevertheless, in performing its analysis, the USFS also properly considered the conclusions of the ADEQ about the safety of reclaimed water from Rio de Flag and the safety of making snow from

Class A+ reclaimed water like that produced at Rio de Flag. *See, e.g.*, *Edwardsen v. U.S. Dep't of the Interior*, 268 F.3d 781, 789 (9th Cir. 2001); *Okanogan Highlands Alliance*, 236 F.3d at 477; *Friends of the Payette v. Horseshoe Bend Hydro-electric Co.*, 988 F.2d 989, 993 (9th Cir. 1993). Federal policy encouraged the USFS to do so. *See* 42 U.S.C. §§ 4331(a), 4332(C). Thus, we affirm the district court's conclusion that the USFS did not fail to ensure the scientific integrity of its analysis in considering the ADEQ's conclusions.

### 3. Whether the USFS Provided "High Quality" Environmental Information to the Public About the Safety of Exposure to Reclaimed Water

We decline to reach the issue of whether the USFS failed to provide "high quality" information about the impacts of ingesting snow made from reclaimed water because the Save the Peaks Plaintiffs have waived it on appeal. The district court found that the Save the Peaks Plaintiffs had abandoned this claim by failing to respond to the USFS's summary judgment motion on this issue. Moreover, in their opening brief, the Save the Peaks Plaintiffs do not argue that the district court erred in finding that it had abandoned this claim. Thus, the Save the Peaks Plaintiffs have waived this claim on appeal. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009); *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

## CONCLUSION

For the foregoing reasons, we affirm the district court. Accordingly, the Save the Peaks Plaintiffs' request for reasonable fees and costs is denied.

**AFFIRMED.**